**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

PATRICIA STEPHENS,
              *Plaintiff-Appellant,*

v.

COUNTY OF ALBEMARLE, VIRGINIA;
CITY OF CHARLOTTESVILLE; RIVANNA
SOLID WASTE AUTHORITY,
              *Defendants-Appellees.*

No. 07-1478

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
Norman K. Moon, District Judge.
(3:04-cv-00081)

Argued: March 18, 2008

Decided: May 9, 2008

Before Sandra Day O'CONNOR, Associate Justice (Retired),
Supreme Court of the United States, sitting by designation,
WILLIAMS, Chief Judge, and HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Chief Judge Williams
wrote the opinion, in which Associate Justice O'Connor and Senior
Judge Hamilton joined.

## COUNSEL

**ARGUED:** Deborah Chasen Wyatt, WYATT & ASSOCIATES,
P.L.C., Charlottesville, Virginia, for Appellant. Alvaro Antonio Inigo,

ZUNKA, MILNOR, CARTER & INIGO, LTD., Charlottesville, Virginia, for Appellees. **ON BRIEF:** Richard H. Milnor, ZUNKA, MIL-NOR, CARTER & INIGO, LTD., Charlottesville, Virginia, for Appellees.

---

**OPINION**

WILLIAMS, Chief Judge:

After Patricia Stephens's husband, Wayne Stephens, died in an explosion at a landfill near Ivy, Virginia, she brought this action under 42 U.S.C.A. § 1983 (West 2003 & Supp. 2006) against the landfill's operators—the County of Albemarle, the City of Charlottesville, and the Rivanna Solid Waste Authority ("RSWA")[1] (collectively "Appellees"). Ms. Stephens claims that two settlement agreements between Appellees and third-parties unconstitutionally conditioned government benefits on the relinquishment of the third-parties' First Amendment rights to speak freely about the landfill, thereby depriving her and her husband of their First Amendment rights to receive information. She further claims that this violation proximately caused Wayne Stephens's death.

The district court granted summary judgment in favor of Appellees, reasoning that the settlement agreements did not make any government benefit contingent on the surrender of First Amendment rights. We conclude, however, that because Ms. Stephens, both individually and as her husband's personal representative, lacks standing to pursue her claims, the district court was without subject-matter jurisdiction to consider the merits of her claims. We therefore vacate the judgment of the district court and remand for dismissal of Ms. Stephens's case.

I.

This appeal is from the district court's grant of summary judgment

---

[1]The Rivanna Solid Waste Authority ("RSWA") is a distinct governmental entity jointly operated by the County of Albemarle and the City of Charlottesville.

in favor of Appellees, so we review the facts in the light most favorable to Ms. Stephens. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

Ms. Stephens resides in the area of Albemarle County, Virginia known as Ivy, near the landfill operated by Appellees. Her husband, Wayne, worked as the landfill's manager until April 10, 2003, when a cutting torch that he was using to cut old oil storage tanks for resale as scrap metal sparked an explosion, killing him. Cutting fuel tanks in this manner was a serious violation of the regulations of the Occupational Safety and Health Administration ("OSHA"). OSHA cited the RSWA for six separate serious violations in connection with the explosion. These failings, however, do not represent the basis for the present litigation, which focuses instead on Appellees' actions several years earlier, when a number of Stephens's neighbors raised concerns about the landfill's environmental impacts.

In the mid-1990s, plans to maximize the amount of trash that could be put into the landfill spurred a number of individuals living near the landfill to form a citizens group called the Ivy Steering Committee (hereinafter the "Committee"). Concerned primarily about water and air pollution from the landfill, Committee members educated themselves "about the issues at the landfill" and met, usually on a weekly basis, to discuss those issues. (J.A. at 207.) On a number of occasions, Committee members relayed their concerns to regulatory agencies, at one point writing letters to the Environmental Protection Agency ("EPA") and writing many letters to the Virginia Department of Environmental Quality. Committee members also wrote letters to the RSWA, and some members, particularly David Booth and Ed Strange, often called the RSWA to voice concerns. The Committee did not make public the minutes of its meetings. It did, however, maintain a website and erected a billboard with a "Mr. Yucky face"-style design that was related to issues of water pollution.

The Stephenses were not members of the Committee and did not attend the meetings. In the course of this lawsuit, Ms. Stephens has, however, gathered information through discovery regarding the group's discussions. One member, Ed Strange, stated that although the concerns discussed "most often involved water and air pollution,

. . . discussions were by no means limited to these concerns and in fact covered virtually any activity taking place at the landfill." (J.A. at 274.) Another member, Daniel Burke, agreed that the discussions could extend to, for example, worker safety, explaining that if anyone in the Committee knew about a practice that endangered the life or safety of an employee at the landfill, it would definitely have come up in the meetings. Burke did not, however, remember discussing any worker-safety concerns that were not coextensive with the Committee members' own concerns about water and air quality. He explained that, before learning of Wayne Stephens's death in the newspaper, he personally did not have any misgivings about this aspect of the land-fill's operations, as he had "no reason to . . . believe that they weren't professional at burying trash." (J.A. at 246.)

In 1998, the Committee, dissatisfied with the results of its calls and letters, instituted a lawsuit against Appellees. In *Weber v. RSWA*, 3:98cv0019 (W.D. Va. 1998), twenty-four plaintiffs, including indi-viduals living near the landfill as well as the St. John the Baptist Epis-copal Church and the Peacock Hill Water Authority, alleged that the landfill was contaminating the surrounding air and water, in violation of federal and state environmental statutes and state nuisance law. Appellees settled the *Weber* lawsuit with all but four of the plaintiffs by entering into two separate settlement agreements in 2000.

Appellees entered into one of the settlement agreements (the "Booth Agreement") with David and Maureen Booth, whose 26-acre property abutted the landfill. Pursuant to the Booth Agreement, Appellees agreed to purchase the Booths' property. The Booths, in exchange, agreed to, among other things, release their claims against Appellees and sign two letters withdrawing complaints they had made about the landfill to regulatory agencies. Of particular relevance to this appeal, the Booth Agreement also provided that:

> The Booths, to the extent that they have control over such matters and to the extent possible, agree to remove the Ivy Steering Committee website and any language or images from any personal websites and billboards, from the public domain which deal with any of the matters raised in the Action or with respect to the Ivy landfill. Further, the Booths will cease opposition to the Ivy landfill and any fur-

ther permits for which it may apply, will refrain from directly or indirectly opposing the landfill or permitting, will make no further private or public adverse comments about the landfill, and will not engage or solicit from others any opposition to or legal action opposed to said landfill or its permitting process.

(J.A. at 57-58.)

Another settlement agreement, the "Burke Agreement," covered the remaining settling plaintiffs. In the Burke Agreement, Appellees agreed to modify a pending permit application to construct and operate a new waste disposal cell ("Cell 5") at the landfill, as well as to handle particular wastes in certain ways, continue to refuse certain wastes at the landfill, continue to monitor groundwater, purchase certain property from certain plaintiffs, monitor air quality, pay Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") costs, and pay attorneys' fees. Appellees also agreed to install water treatment devices if groundwater contamination exceeded a certain level and to provide the plaintiffs with potable water if contamination exceeded EPA standards; these obligations are not contingent on the settling plaintiffs fulfilling the terms of the Burke Agreement. In exchange, the settling plaintiffs released their claims against Appellees and also agreed not to oppose the Cell 5 permit[2] and to remove from their websites any language or images "which deal with any of the matters raised in the Action with respect to the Ivy landfill." (J.A. at 99.)

David Booth used the funds he received pursuant to the Booth Agreement to relocate to a new home with his wife. Following the settlement, he "never looked back," (J.A. at 186), and thus could not say with certainty whether the Committee continued to hold meetings

---

[2] "Oppose" was defined as submitting written or oral comments in opposition to the permit to the relevant authorities, speaking in opposition to the permit at public hearings, making statements to the press opposing the permit, providing documents to authorities for the purpose of opposing the permit, providing another person with documents or statements in opposition to the permit, or providing another person with documents for use in opposing the permit.

after the two settlement agreements went into effect. He did believe the meetings continued, albeit with a smaller group. Although Booth never actually read the terms of his settlement agreement, he perceived that its restrictions on his speech were extremely broad. As a result, there have been "times [he] wanted to say something and realized [he] could not." (J.A. at 163.) Currently, Booth "d[oesn't] really care," (J.A. at 188), whether a court invalidates the speech restrictions in the Booth Agreement. He does, however, resent the encumbrance it represents. Indeed, he feels that "anybody should be able to have a free say," and that he has topics he would like to talk about were he not constrained by the agreement. (J.A. at 162.)

Similarly, Daniel Burke resents his own settlement agreement to the extent that it restricts his ability to oppose the Cell 5 permit. Offended by the idea that "the local government tried to gag its own citizens," he "wanted to feel free to speak out on that issue" and considered challenging the Burke Agreement, but ultimately decided not to do so. Otherwise, Burke did not have any particular issues he wanted to discuss.

Burke agreed to the provision restricting him from opposing the Cell 5 permit only because he knew that the Burke Agreement did not bind Gertrude and Michael Weber ("the Webers") or Ed and Pamela Strange ("the Stranges"), whom he described as core members of the Committee, and whom he believed would become aware of any problems and act as his voice if necessary. According to Burke, the Webers and the Stranges continued to have meetings, at least with their attorneys and a hydrologist, after the other plaintiffs in the *Weber* suit settled. Burke indicated that others have also discussed issues related to the landfill: he knows of two meetings held to discuss leachate problems from the part of the landfill known as Cell 2, but was out of town for both meetings and thus was unable to attend. Burke did not know about the fuel-tank cutting at the landfill. He, like Booth, learned of Wayne Stephens's death through the newspaper.

Ed Strange, however, learned of the fuel-tank-cutting practice before the explosion. Strange noticed black smoke coming from the landfill approximately seven months before Wayne Stephens's death. He inquired into the matter and learned that the black smoke was discharged in connection with the practice of cutting up storage tanks,

the practice that ultimately killed Wayne Stephens. Although Strange did not sign either settlement agreement and therefore had no restrictions on his speech, he did not contact anyone regarding what he had learned. According to Strange, the Committee meetings abruptly ended following the settlements, and because he no longer had his "group of associates to discuss landfill issues with, [he] took the matter no further." (J.A. at 275.) Strange believes that if the Committee had continued its meetings, he would have initiated a vigorous discussion that would have caused the group to pursue the issue "in whatever fashion necessary to either end the practice or obtain assurances (now known not to exist) that the practice was safe." (J.A. at 275.)

Ms. Stephens, too, believes that the explosion would not have occurred had a citizens group more zealously monitored and opposed the landfill activities. Accordingly, on October 1, 2004, Stephens filed a complaint in the U.S. District Court for the Western District of Virginia asserting three causes of action: (1) a violation of the First Amendment proximately causing death (Count I); (2) a violation of Due Process (Count II), and, (3) violations of Ms. Stephens's and her husband's First Amendment rights to receive information concerning safety and environmental hazards posed by the landfill (Count III). Stephens's complaint sought $15 million in damages for the wrongful death of Wayne Stephens and $1 million in damages for the deprivation of the Stephenses' First Amendment rights to receive information concerning the landfill, as well as declaratory and injunctive relief voiding the Booth Agreement and the Burke Agreement.

The district court initially dismissed Stephens's complaint but subsequently granted, in part, Ms. Stephens's motion to reconsider that decision and reinstated the First Amendment claims (Counts I & III). The crux of these claims was Ms. Stephens's contention that the Booth Agreement and the Burke Agreement unconstitutionally conditioned government benefits on the relinquishment of the settling plaintiffs' First Amendment rights to speak freely about the landfill. This condition, she argued, prevented the dissemination of health and safety information that their neighbors had a reciprocal First Amendment right to receive. Ms. Stephens split the claimed First Amendment violation into two Counts (Counts I & III) because she further alleged that had the settlement agreements not stifled discussion of landfill safety information, someone would have uncovered the

OSHA violations occurring at the landfill, thus preventing Wayne Stephens's death. The district court initially doubted Ms. Stephens's standing to assert these "truly novel" claims. (J.A. at 24.) Upon reconsidering its dismissal of Counts I and III at the pleading stage, however, the district court concluded that because Ms. Stephens's complaint alleged the existence of one or more willing speakers and also alleged that she and her husband were potential recipients of speech from the parties to the settlement agreements because they lived in Albemarle County near the landfill, Ms. Stephens, both in her own right and on behalf of her deceased husband, had standing to pursue her First Amendment claims.

Ultimately, the district court granted summary judgment in favor of Appellees. Without revisiting the issue of standing, the court rejected Ms. Stephens's claims on the merits, reasoning that because neither the Booth Agreement nor the Burke Agreement conditioned a government benefit on the surrender of First Amendment rights, Ms. Stephens could not prevail.

Ms. Stephens timely appealed, and we have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).[3]

## II.

As a court of limited jurisdiction, we have "a special obligation to satisfy [our]self not only of [our] own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (internal quotation marks omitted). "When the lower federal court lacks jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." *Id.* (internal quotation marks and alteration omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without

---

[3]Ms. Stephens does not appeal the district court's dismissal of the Due Process claim (Count II) under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (J.A. at 15.) Accordingly, this claim is not before us.

exception." (internal quotation marks and alteration omitted)). To that end, we must "assure ourselves of [Stephens's] standing under Article III," for the requirement of standing enforces "the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 340, 341-42 (2006) (internal quotation marks omitted).[4]

It is well-established that, to satisfy Article III's standing requirements, a plaintiff must show that:

> (1) [she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

The Supreme Court in *Lujan* explained that a plaintiff establishes her standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." 504 U.S. at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks and alteration omitted). "In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must 'set forth' by affidavit or other evidence 'specific facts' . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)).

---

[4]To assist us in this endeavor, we requested supplemental briefs from the parties addressing Ms. Stephens's standing to pursue her claims on behalf of herself and Wayne Stephens. We appreciate the help that they provided.

Ms. Stephens claims that she has set forth a sufficient factual basis for her standing to withstand summary judgment on that ground. According to Ms. Stephens, both she and her husband have suffered "injuries in fact"—violations of their First Amendment right to receive information—that were caused by the speech restrictions Appellees obtained through the settlement agreements and are redressable by a favorable decision in this case. Appellees counter that neither Ms. Stephens nor her husband was a potential recipient of speech covered by the Booth and Burke Agreements. Appellees therefore contend that because the Stephenses would not have received information from the settling plaintiffs about health and safety concerns posed by the landfill, they were not injured by the speech restrictions in the Booth and Burke Agreements. We agree that Stephens's allegations of injury are simply too speculative to support standing.

To be sure, "[i]t is now well established that the Constitution protects the right to receive information and ideas" from a willing speaker. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976) (explaining that where a willing speaker exists, "the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both").

But to have standing to assert a right to receive speech, a plaintiff must show that there exists a speaker willing to convey the information to her. *See FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 838-39 (3d Cir. 1996) (holding that plaintiffs with an interest in a lawsuit had standing to challenge gag order constraining the speech of parties to a widely publicized adoption case because one party to the case had spoken publicly before the gag order, supporting the inference that it would be willing to do so again); *In re Application of Dow Jones & Co.*, 842 F.2d 603, 606-08 (2d Cir. 1988) (holding that news agencies had standing to challenge gag order constraining speech of trial participants because extensive pretrial publicity showed that the trial participants were willing speakers and that the news agencies were in fact potential receivers of the restrained speech); *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 787 n.12 (1st Cir. 1988) (holding that third-party public interest group had standing to challenge protective order in court case because

the plaintiffs clearly indicated that they would disseminate the information if permitted to do so, meaning that modification of the order would, as a practical matter, guarantee the group access to documents).

Here, Stephens provided deposition testimony from Booth and Burke indicating their willingness to speak about matters covered by their respective settlement agreements. Booth stated that there were "times [he] wanted to say something and realized [he] could not," (J.A. at 163), because of the Booth Agreement. Similarly, Burke expressed resentment toward the inclusion of a speech restraint in the Burke Agreement and a desire to see the restriction lifted. Thus, Ms. Stephens has presented evidence that at least one of the signatories to each settlement agreement would be a willing speaker in the absence of the agreements.

Ms. Stephens has not, however, offered any indication that these willing speakers would have discussed the landfill with her or her husband in the past or that they would presently discuss the landfill with her if they were not constrained by the settlement agreements. Neither Booth nor Burke claimed to have spoken to either of the Stephenses regarding the landfill in the past or to have had any desire to do so. And, looking forward, neither Booth nor Burke have indicated that there is any particular landfill-related issue that either of them would like to discuss. Burke stated that he currently only takes issue with, and wants to speak about, the speech restriction itself; Booth has "never looked back," (J.A. at 181), and "d[oesn't] really care," (J.A. at 188), if the speech restriction is lifted, though he does resent the encumbrance it represents.

Moreover, Ms. Stephens has not sought to discuss the landfill with either Booth or Burke. Burke did not know Stephens, and although Stephens did know Booth, who had been a relatively close neighbor of hers before he relocated, she saw him only on a few occasions after he moved and has never approached him with any questions related to Wayne Stephens's death. Thus, there exists no direct connection between Booth and/or Burke and Stephens such that, absent the settlement agreements, Stephens would expect to receive the information that Booth and Burke possessed. *Cf. Lamont v. Postmaster Gen.*, 381 U.S. 303, 304-05 (1965) (successful challenge to a statute restricting

the right to receive certain publications (deemed communist propaganda) through the mail brought by two individuals whose publications had been detained by the postal service).

Nevertheless, Ms. Stephens argues that she "stands among the core class of foreseeable recipients of the banned safety speech," (Supp. Br. of Appellant at 1), urging us to presume that, because she lives near Booth, Burke, and the landfill, she is a potential recipient of Booth's and Burke's landfill-related speech. This contention, however, is belied by the absence of any indication that Stephens ever once was a recipient of such information from Booth, Burke, or any other Committee member during the years when she claims those individuals were outspoken, as well as by her failure to seek out information from signatories of the Booth and/or Burke Agreements. Although Ms. Stephens alleges that her neighbors were vocal in discussing problems at the landfill prior to the settlements, she does not claim that either she or her husband, who were not members of the Committee, ever heard or read anything from this vociferous group. Similarly, although Ms. Stephens offered evidence that the Committee maintained a website impacted by the settlement agreements, she does not assert that either she or her husband ever visited (or attempted to visit) that website. Instead, she leaves us to speculate that, although she did not receive information from Committee members in the past by virtue of her status as a neighbor and has not actively sought information from them, something might have changed such that she would now hear from Booth and Burke if they could speak freely. In so doing, she forgets that, to satisfy Article III's standing requirements, a plaintiff must suffer an injury that is "actual and imminent" not "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).

In sum, Ms. Stephens merely speculates that she and/or her husband would have been and that she continues to be a potential recipient of speech from members of the Committee, specifically, Booth and Burke, had those individuals not been subject to restrictions imposed by the Booth and Burke Agreements, respectively. Because Stephens has not provided any factual support for this conjecture, she cannot demonstrate that the speech restrictions in the settlement agreements caused her, or her husband, any injury. Accordingly, both

individually and as Wayne Stephens's personal representative, she lacks standing to pursue her First Amendment claims.

## III.

For the foregoing reasons, we vacate the judgment of the district court and remand with instructions to dismiss Ms. Stephens's case for lack of jurisdiction.

*VACATED AND REMANDED*