In re Application of NATIONAL BROADCASTING CO., et al., Applicants-Appellants,

v.

UNITED STATES DEPARTMENT OF JUSTICE, Respondent-Appellee.

No. 1005, Docket 83–9040.

United States Court of Appeals, Second Circuit.

Argued April 4, 1984.

Decided May 23, 1984.

Floyd Abrams, New York City (Cahill, Gordón & Reindel, Devereux Chatillon, New York City, of counsel), for applicants-appellants.

Douglas Letter, Atty., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C. (Alan H. Nevas, U.S. Atty., New Haven, Conn., Richard K. Willard, Acting Asst. Atty. Gen., Barbara L. Herwig, Atty. Dept. of Justice, Washington, D.C., of counsel), for respondent-appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

FEINBERG, Chief Judge:

National Broadcasting Company, Inc., (NBC) and various individuals who are present or former NBC officers and employees (collectively referred to as NBC), appeal from a judgment of the United States District Court for the District of Connecticut, T.F. Gilroy Daly, Ch. J., denying an application to inspect and copy material obtained by, or related to, electronic surveillance conducted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–2520. The basis of Chief Judge Daly's decision was that the district court lacked power to require the government to disclose most of the material sought and that no "good cause" had been shown as to the remainder. For reasons indicated below, we affirm the judgment of the district court.

I.

The application grows out of a libel action now pending in the United States District Court for the District of Nevada brought by Wayne Newton, a prominent entertainer, against appellants and others. The complaint in that action claims that NBC libeled Newton in three television news broadcasts in October and November 1980 and in June 1981. These broadcasts concerned, among other things, investigations into organized crime and an indict-

ment by a federal grand jury in Connecticut of Guido Penosi and Frank Piccolo, and applications to Nevada gaming authorities regarding licenses for Newton and others to own and operate the Aladdin Hotel and Casino in Las Vegas. Newton testified both before the grand jury and at two trials of Penosi.

The broadcasts focused on the relationship between Newton and Penosi, who was allegedly involved in organized crime. The October 1980 broadcast stated that Newton had called Penosi for help with "a problem" and that the latter had contacted another "mob boss", Frank Piccolo, to solve the problem. The broadcast reported, among other things, that Piccolo had "taken care of Newton's problem, and had become a hidden partner in the Aladdin hotel deal." The broadcast also reported Newton's testimony to Nevada regulatory authorities denying any "relationship" with Penosi, the frequent telephone conversations between the two and the belief of federal officials that Newton had not told the "whole story." The November 1980 broadcast reported Newton's appearance before the federal grand jury in Connecticut; the June 1981 broadcast reported the indictment in Connecticut of Piccolo and Penosi, and stated that Newton had become a "victim" of a "mob scheme."

The indictment, which apparently grew out of a series of wiretaps by the government under Title III, charged a conspiracy to extort money from Newton, his business manager and another entertainer in violation of the Hobbs Act, 18 U.S.C. § 1951. Pursuant to Title III, the government had filed sealed affidavits that presumably demonstrated probable cause to believe that the wiretaps would uncover criminal activity. Piccolo was killed before the criminal case went to trial. Penosi was tried twice; the first trial resulted in a hung jury, the second in acquittal. Some of the recordings arising out of the wiretaps were admitted into evidence at the trials.

In the Nevada libel action against appellants, Newton alleged that the NBC broadcasts in 1980 and 1981 were false and defamatory. Since the falsity of the factual statements made in the broadcasts is a key element of the case, evidence tending to prove the truth of the statements is obviously significant. On the theory that such evidence would be uncovered, NBC sought permission in the Connecticut District Court to inspect and copy for use in defense of the Nevada libel action the following materials:

(1) the application of the United States Government dated May 13, 1980, [to the district court] pursuant to 18 U.S.C. § 2518 for electronic surveillance of certain persons including Frank Piccolo, and the affidavit submitted in support thereof;

(2) the order of [the court] granting such application;

(3) the application of the United States Government dated June 12, 1980, to [the court] pursuant to 18 U.S.C. § 2518 for an order authorizing an extension of the electronic surveillance described above and the affidavit submitted in support thereof;

(4) the order of [the court] granting such application;

(5) progress reports made to [the court] concerning conversations intercepted pursuant to the above orders; and

(6) a copy of the recording of each intercepted communication obtained pursuant to [the court's] orders described above, and any written transcripts thereof, that relate or refer to: the Aladdin Hotel, Carson Wayne Newton, a/k/a Wayne Newton, Guido Penosi, Frank Piccolo, Mark Moreno or Anthony Gambardella. . . .

The government opposed disclosure of the documents requested. It pointed out to the district court, among other things, that the wiretap material contained 667 reels of tape, that "the conversations of hundreds of persons" had been intercepted, that few of them had actually been investigated and that the wiretap applications contained descriptive data regarding confidential informants.

The court below held that the wiretaps had been made legally, but that it lacked the power to order the government to disclose their contents (item 6 above) in a civil proceeding to which the government was not a party. The court also denied access to the government's applications and other related material (items 1–5 above) because appellants had not shown "good cause" pursuant to 18 U.S.C. § 2518(8)(b). This appeal followed.

## II.

■ In pursuing this application, NBC relies principally on 18 U.S.C. § 2517(3), which provides:

Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter *may disclose the contents of that communication* or such derivative evidence *while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.* (Emphasis added.)

This section, according to NBC, allows the government to disclose "in any proceeding held under the authority of the United States" a communication obtained by a legal wiretap. Since the libel action in the federal district court in Nevada is obviously a proceeding "held under the authority of the United States," NBC argues that the district judge erred in denying its application.

NBC's argument based upon the language of § 2517(3) has a surface plausibility, but only if one concentrates on the language alone and ignores the rest of Title III and the legislative struggle leading to its enactment. Title III was the culmination of a long battle between those who would have altogether prohibited wiretaps and the material obtained thereby and those who wanted to allow the government to use wiretap material in criminal prosecutions. In the resulting statute, Congress

recognized that wiretapping could be highly intrusive of privacy; the legislation therefore specifically put strict limits on wiretapping and on how it could be used. See S.Rep. No. 1097, 90th Cong., 2d Sess. 67, 161–65, reprinted in 1968 U.S.Code Cong. & Ad.News 2112, 2154, 2222–27. In construing the statute, it should always be remembered that "although Title III authorizes invasions of individual privacy under individual circumstances, the protection of privacy was an overriding congressional concern." *Gelbard v. United States*, 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972) (footnote omitted).

We start from the proposition that use of evidence obtained by wiretapping was broadly banned by *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Court, however, indicated, id. at 355–56, 88 S.Ct. at 513–14, that this general principle was subject to an exception where a court had previously authorized government agents to engage in wiretapping on a limited basis. Congress responded to this suggestion by the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197, 212–25 (1968). See S.Rep. No. 1097, supra, at 66, 1968 U.S.Code Cong. & Ad.News at 2153. Section 2511, part of the new enactment, makes wiretapping criminal except as provided in the statute. Section 2515 provides that whenever any wire or oral communication had been intercepted

no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

The statute then provides in § 2516 for applications to judges to engage in wiretapping; and § 2517 deals with the authoriza-

tion for disclosure and use of intercepted wire or oral communications.

The first two subsections of § 2517 allow law enforcement personnel to use wiretap material in performing their official duties and to provide the material to other law enforcement officials. The third subsection allows broader disclosure of wiretap material through the testimony of a government agent, but obviously only after the government has determined that the interests in disclosure outweigh the important privacy interests that Congress sought to protect in Title III. Cf. *In re Applications of Kansas City Star*, 666 F.2d 1168, 1176 (8th Cir.1981). Thus, subsection (3), as originally written, provided that any person who has received any information concerning or evidence derived from a wire or oral communication intercepted in accordance with the provisions of this chapter "may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any *criminal* proceeding in any court of the United States or of any State or in any Federal or State *grand jury proceeding.*" (Emphasis added.) It is clear that if matters had remained this way NBC would have no case.

NBC's position rests on a 1970 amendment, Pub.L.No. 91–452, § 902(b), 84 Stat. 922, 947 (1970), which changed § 2517(3) so that the final clause now reads "while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof." NBC argues that this language literally applies to its case. However, turning Title III into a general civil discovery mechanism would simply ignore the privacy rights of those whose conversations are overheard. We agree with the government that this was not the intention of Congress. See *United States v. Dorfman*, 690 F.2d 1230, 1233 (7th Cir. 1982) ("we find no evidence that [the draftsmen of section 2517(3)] wanted to create a right of public access"). The change in § 2517(3) was accomplished in § 902(b) of the Organized Crime Control Act of 1970; the stated purpose of this Act

was "to seek the eradication of organized crime in the United States....." Section 902(b) itself was part of Title IX, which comprised the Racketeer Influenced and Corrupt Organizations Act (RICO). We need not decide whether the extension covers only government civil RICO proceedings, and does not apply to such other proceedings as government civil antitrust actions, actions by the Securities and Exchange Commission, defense of tax refund suits or private civil RICO actions. The suit against NBC in Nevada is none of these, and we are sure that Congress did not utilize a provision in the Organized Crime Control Act to make the fruits of wiretapping broadly available to all civil litigants who show a need for them. Indeed, there might be a constitutional question whether Congress could go that far. What the Supreme Court contemplated in *Katz* was a statute making an exception from the general ban for purposes of enforcement of the criminal law. If there is a constitutional doubt, the statute should be construed so as to avoid it.

NBC argues that it is somehow unseemly that only the government can take advantage of wiretaps. This argument does not have much force. Under Title III, with few exceptions not here relevant, no one other than the government can lawfully engage in wiretapping and it therefore is not so unusual that only the government can enjoy its fruits. Beyond that, the government is in a position to make a judgment whether disclosure of the intercepted evidence will or will not be in accordance with the overall public interest, while a private litigant is not. NBC is certainly right in saying that the government should not be arbitrary in making the disclosure to some private citizens but not to others. However, we are willing to accept the government's explanation at oral argument that a few cases in which disclosure has been made to private parties occurred before the Department of Justice had focused on the problem and that it is now following a policy of non-disclosure in all private litigation save perhaps in private civil RICO

suits or in other situations where release would be compatible with the purposes of Title III.[1] We hold, therefore, that the district court correctly denied the application to inspect and copy the recordings and any transcripts thereof.

### III.

 NBC also argues that, under 18 U.S.C. § 2518(8)(b), at least it is entitled to inspect and copy the applications and orders relating to the wiretaps. That section provides:

> Applications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. *Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction* and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years. (Emphasis added.)

Quoting from *In re Applications of Kansas City Star*, supra, 666 F.2d at 1176, NBC claims that it has shown "a need for disclosure" because the materials will certainly lead to discovery of admissible evidence in the libel action. But we do not think that this is the proper test. Based upon our reasoning in Part II, supra, we believe that Congress also did not intend this section to be used as an avenue for discovery by all private litigants in civil cases, unless they are directly aggrieved by a wiretap. In this regard, the Senate Report on the 1968 enactment of Title III states that "applications and orders for authorization shall be treated confidentially.... [They] may not be disclosed except incidental to the disclosure or use of the records themselves after showing of good cause, for example, under [subsection] (10)(a)...." S.Rep. No. 1097, supra, at 105, 1968 U.S.Code Cong. & Ad.News at 2194. Subsection (10)(a) provides for standing for an "aggrieved person" to move to suppress "the contents of any intercepted wire or oral communication ...

or evidence derived therefrom...." NBC cannot claim it is an "aggrieved person" as defined in section 2510(11) as "a party to any intercepted wire or oral communication or a person against whom the interception was directed." See also *United States v. Ferle*, 563 F.Supp. 252 (D.R.I.1983) (denying access to newspaper); cf. also *United States v. Florea*, 541 F.2d 568, 575 (6th Cir.1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977). In any event, we agree with Judge Daly that

> NBC has not shown why it cannot defend its broadcasts in this context without the sealed material, through the information it has in its own files and through the sources that were available to it at the time it prepared the news stories at issue, and which presumably formed the basis for those broadcasts.

The district court was correct in ruling that in this context, NBC had not demonstrated the "good cause" required under the statute.

Judgment affirmed.

---

**1.** Indeed, a regulation would seem to be the sensible way of handling this problem.