600 F.Supp.2d 504 (2009)
In the Matter of the Application of the NEW YORK TIMES COMPANY TO UNSEAL WIRETAP AND SEARCH WARRANT MATERIALS in:
United States
v.
Brener, 08 Cr. 0533.
United States
v.
Suwal, 08 Cr. 0497.
United States
v.
Lewis, 08 Cr. 0433.
No. M-50.
United States District Court, S.D. New York.
February 19, 2009.
Order Denying Motion to Amend March 19, 2009.
*505 David E. McCraw, Vice President & Assistant General, The New York Times' Company, New York, NY, for the New York Times Company.
Daniel L. Stein, Deputy United States Attorney, U.S. Attorney's Office, New York, NY, for the Government.
Stuart E. Abrams, Frankel & Abrams, New York, NY, for John Doe.

OPINION AND ORDER
JED S. RAKOFF, District Judge.
It is largely left to the judiciary to find the right balance between, on the one hand, the public's right to know what the government and the courts are up to and, on the other hand, the government's right to protect the confidentiality of ongoing criminal investigations and the rights of individual citizens to maintain their privacy. But reasonable compromises and concessions by the interested parties can, as here, assist the Court in achieving a balance that permits substantial disclosure while minimizing its intrusiveness.
Here, the New York Times Company (the "Times") seeks the unsealing and production of wiretap applications and related materials associated with the Government's investigation of the Emperor's Club V.I.P. ("Emperor's Club"), a prostitution and money-laundering ring whose bestknown client was former New York Governor Eliot Spitzer. By way of background, in early January of 2008 the Government applied to the District Court for the Southern District of New York for authorization to intercept the incoming and outgoing calls on a cellular telephone that there was good reason to believe was being used to further the business of a prostitution ring. On January 8, 2008, a judge of this Court authorized this wiretap for a 30-day period, and, on February 11, 2008, the authorization was renewed for an additional 30 days. Declaration of Daniel L. Stein dated January 14, 2009 ("Stein Decl.") ¶ 2(a). Meanwhile, on January 23, 2008, the Government obtained judicial authorization to wiretap for 30 days a second cellular telephone also involved in the business of the ring, and this authorization was renewed for another 30 days on February 21, 2008. Id. ¶ 2(b). In addition, on January 25, 2008, the FBI obtained a search warrant for an email account with the address "emperorsclubvipny@yahoo.com." Id. ¶ 5.
In the case of the two wiretaps, the initial applications were supported by affidavits setting forth the evidence that established the prerequisites for the taps, and the requests for renewal were supported by interim reports detailing information that had been learned thus far and the reasons for further monitoring. The search warrant application was supported by an affidavit containing, among other things, summaries of communications obtained from the wiretaps. All of these materials, *506 along with the authorization orders and the search warrant, were placed under seal by the issuing judges. Indeed, in the case of the wiretap applications, the judges were required to do so by 18 U.S.C. § 2518(8)(b) of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 ("Title III"), the statute that governs the interception of wire and electronic communications by law enforcement agents.
On March 6, 2008, the Government, as a result of its investigation of the Emperor's Club, brought criminal chargesspecifically, conspiracy and money laundering chargesagainst four individuals: Mark Brener, Cecil Suwal, Temeka Rachelle Lewis, and Tanya Hollander. All of these individualsthe apparent operators of the ringsubsequently pled guilty. Shortly after the Government filed the charges, it became publicly known that Eliot Spitzer was a client of the Emperor's Club. See, e.g., Danny Hakim and William K. Rashbaum, Spitzer Is Linked to Prostitution Ring, N.Y. Times, March 10, 2008, available at http://www.nytimes.com/2008/03/10/nyregion/locnd-spitzer.html?scp=2&sq=spitzer&st=cse. In the days that followed, Spitzer resigned his post as Governor of New York. Ultimately, no criminal charges were brought against Spitzer or against any other individual beyond the four persons initially charged. See Stein Decl. ¶ 4.
In late December 2008, the New York Times brought the instant motion to intervene in the above-referenced criminal cases and to unseal materials associated with the wiretap and search warrant applications made in the course of the Emperor's Club investigation. After the New York Times filed its motion, the Government gave notice of the motion to as many of the 67 individuals named in these materials as they could locate, most of whom were apparent customers of the ring. On January 14, 2009, one "John Doe" moved to intervene in order to oppose the Times' application. Eight other individuals contacted counsel for the Times and for the Government to express concerns about the prospect of unsealing these materials. They chose not to seek to intervene, however, after the Times and the Government entered into a stipulation pursuant to which the Government agreed to redact the names and identifying information of those individuals and the Times agreed not to seek any such information.
Because a motion to intervene is the procedurally proper device for asserting a right of access in a criminal proceeding, see, e.g., United States v. King, 140 F.3d 76, 77-78 (2d Cir.1998), both the Times' and John Doe's motions to intervene are hereby granted.
As for the motion to unseal, while the motion was being briefed the Government agreed to release to the Times a redacted version of the affidavit supporting the FBI's application for the search warrant for the "emperorsclubvipny@yahoo.com" email account, and the Times accepted the redacted version in satisfaction of the portion of its motion as sought that affidavit. Times Reply Mem. at 2. What remained, then, was the motion to unseal the materials relating to the two wiretaps; but at oral argument counsel for the Times confirmed its agreement to permit the Government to redact the names and identifying information of all customers whose names appear in the materials (presumably, however, not including Spitzer, who had previously been publicly identified) not just those who had contacted the Government and were covered by the stipulation. Transcript of oral argument on January 27, 2009 ("Tr.") at 5. The scope of the motion was therefore limited to seeking the release of the wiretap materials so *507 redacted. The Court now grants that motion.
Initially, three basic principles inform that determination. First, all the sought materials, although docketed under seal, are "judicial records." In United States v. Amodeo, 44 F.3d 141, 145 (2d Cir.1995) ("Amodeo I"), the Second Circuit defined a "judicial document" as a document that is filed with the court and is "relevant to the performance of the judicial function and useful in the judicial process." Although the question whether wiretap materials such as those at issue here are "judicial documents" has not previously been decided, such documents are plainly "relevant to the performance of the judicial function" in that courts must necessarily review them in order to perform their Congressionally-appointed task of approving or disapproving wiretap applications and their extensions.
Second, since the materials here sought are judicial documents, they are presumptively subject to public access. The press and public have long enjoyed both a common law and a First Amendment right of access to judicial processes and records. As the Supreme Court noted in Nixon v. Warner Communications, Inc., 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." Such a right furthers "the citizen's desire to keep a watchful eye on the workings of public agencies," id. at 598, 98 S.Ct. 1306, often assisted by "a newspaper's intention to publish information concerning the operation of government," id. The First Amendment, moreover, guarantees public access not only to criminal trials but to such pretrial proceedings as suppression hearings (where wiretaps are often unsealed and challenged). See In re New York Times, 828 F.2d 110, 113-14 (2d Cir.1987). Because of the importance of such public monitoring of the courts, the Second Circuit has held that there is a presumption in favor of disclosure, United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995) ("Amodeo II"), which is at its strongest when, as here, the documents are directly relevant to the exercise of a court's Article III judicial power, id. at 1049.
Third, once a district court has determined the weight to be given to the presumption, the court then balances this against the factors weighing in favor of maintaining confidentiality, such as the government's law enforcement interests and the privacy interests of affected parties. Id. at 1050. The decision over whether to grant access is "left to the sound discretion of the trial court." Nixon, 435 U.S. at 599, 98 S.Ct. 1306. See also Amodeo I, 44 F.3d at 146.
Although the foregoing principles have constitutional underpinnings, their application in this case is arguably impacted by the specific provisions of Title III governing disclosures, provisions that were designed both to protect the integrity of ongoing Government investigations and to protect the privacy of people whose phone calls might be tapped. See In re Kansas City Star, 666 F.2d 1168, 1175 (8th Cir. 1981); In re New York Times, 828 F.2d at 115. The provision of Title III of relevance here states that
[a]pplications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction . . . .
18 U.S.C. § 2518(8)(b). But although the Government argues that the "good cause" *508 standard of § 2518(8)(b) displaces the aforementioned principles developed by the courts, there is no reason to believe that Congress intended "good cause" to be anything other than a synonym for the balancing dictated by the aforementioned constitutional and common law principles. Rather, in using the familiar common law term of "good cause" to set the standard for disclosure, Congress plainly intended to incorporate the well-established disclosure principles summarized above.[1]
This is not to say that Title III as a whole has no bearing on the analysis here, just as, conversely, the interpretation of Title III is informed by the Constitution. An attentive reading of Title III itself and the cases applying it does instruct the Court that it should give particularly careful consideration to the privacy interests of affected individuals, see In re New York Times, 828 F.2d at 115, and to law enforcement's interest in preserving the confidentiality of a given investigation, see In re Kansas City Star, 666 F.2d at 1175. The Government has also suggested that the Court should consider law enforcement's interest in preserving the confidentiality of its surveillance techniques generally, see Tr. at 16. None of these factors, however, is incompatible with giving consideration, in determining whether good cause exists under the statute, to the principles and presumption underlying the public's right of access to judicial documents outside the Title III context.
In the instant case, there is an obvious interest in obtaining information about the origins of an investigation that led, ultimately, to the resignation of the Governor of New York. Indeed, a Congressional Committee has even called for an examination of the reasons underlying the initial decision to undertake the investigation, see Danny Hakim, Panel Asks How Inquiry Began on Spitzer Banking, N.Y. Times, November 25, 2008, available at http://www.nytimes.com/ 2008/11/26/nyregion/26spitzer.html?scp=1&sq=hakim,% 20panel% 20asks% 20how% 20 inquiry% 20began% 20on% 20spitzer% 20banking&st=cse. Against this, the Government asserts the general privacy and law enforcement confidentiality concerns noted above; but it concedes, importantly, that in this particular case there is no continuing need for confidentiality concerning the investigation, which has concluded, see Tr. at 19, nor are there sensitive law-enforcement techniques at stake, see id. at 17. In such circumstances, the very kind of materials here in issue are routinely unsealed after indictment, if only temporarily, so that defense counsel can review, and challenge, the wiretaps. See 18 U.S.C. § 2518(8)(d). As for privacy concerns which are also asserted by the John Doe who intervened, and which would be significant if any names (other than Mr. Spitzer's) were to be releasedany threats to privacy are eliminated by the redactions previously agreed to by the parties.
Given the strong and obvious public interest in disclosure, and the absence of any significant countervailing considerations in this particular case, good cause has been established within the meaning of 18 U.S.C. § 2518(8)(b). Accordingly, the New York Times' motion to unseal the wiretap materials is hereby granted and the Government is ordered to produce the materials to the Times, in the redacted *509 form previously agreed to, see Tr. at 5, by no later than Tuesday, February 24, 2009.[2]
SO ORDERED.

MEMORANDUM ORDER
On December 24, 2008, the New York Times Company (the "Times") moved to unseal wiretap applications and related materials associated with the above-captioned cases. On February 19, 2009, after full briefing and oral argument, the Court granted the application. See Opinion and Order, 2/19/09. On February 20, 2009, the Court granted the Government's request to stay execution of the order while it considered whether or not to appeal, and on March 2, 2009, the Government filed a notice of appeal. Although fully apprised of all these proceedings, counsel for Eliot Spitzer waited until March 4, after the Court had ruled and after the Government had appealed, to notify the Court that it wished to move to intervene so that it could seek further redactions of the wiretap materials beyond those agreed to by the Government and the Times. Having now considered Spitzer's papers in support of his motion to intervene and his accompanying motion to alter or amend the Order of February 19, 2009, as well as the Times' papers in opposition, the Court hereby denies both motions.
The motions must be denied, first and foremost, because the Court lacks jurisdiction to grant them. In general, the filing of a notice of appeal "divests the district court of its control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). While the Court may, nevertheless, continue to exercise jurisdiction over certain specified post-judgment motions by the parties (such as a motion to alter or amend the judgment), see Rule 4, Fed. R.App. P., no such jurisdiction is accorded to motions by non-parties. See Drywall Tapers and Pointers of Greater New York v. Nastasi & Associates, Inc., 488 F.3d 88, 94 (2d Cir.2007).
Even assuming arguendo the Court had jurisdiction to consider the motions, it would still have to deny the motions as untimely. Mr. Spitzer asserts that the need for him to intervene has only become apparent very recently, when his communications with the Government revealed that it did not plan to redact his name from any part of the wiretap materials even though it had agreed to redact the names of other customers of the Emperor's Club. But the Times, from the moment it filed its original motion, had made it clear that it sought the wiretap materials in order to obtain further information about the Emperor's Club investigation as it pertained to Mr. Spitzer, and the Court's Opinion and Order of February 19, 2009, in recognition of this fact, explicitly confirmed that Mr. Spitzer's name would not be redacted. Opinion and Order, 2/19/09, at 4. Thus, there is no reasonable excuse for Spitzer's delay in bringing the instant motions, and, at this stage, further delay would serve only to prejudice the Times' desire to expedite the appeal so as to obtain disclosure of the materials as promptly as possible.
The Court is not without sympathy for Mr. Spitzer's desire to avoid another round of the salacious coverage that has attended his involvement with the Emperor's Club. Sympathy, however, can neither create jurisdiction *510 nor obviate untimeliness. Spitzer's motions are therefore denied.
SO ORDERED.
NOTES
[1] While the Times argues that the interim reports submitted by the Government to obtain renewal of the authorization for each wiretap are not subject to the "good cause" requirement because they are not mentioned in 18 U.S.C. § 2518(8)(b) and Title III does not otherwise supply a standard to govern their disclosure, this argument is irrelevant if, as here, the Court finds no difference between the judicially-established principles of disclosure outlined above and the statutory term "good cause" as used in § 2518(8)(b).
[2] Since the filing of this motion, the Court has received requests for access to the materials from the New York Post and the Wall Street Journal. At the same time that it releases the redacted materials to the New York Times, the Government is directed to produce copies to the New York Post and to the Wall Street Journal as well.