09-0854-cv (L)
In Re: Application of the N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2008

(Argued: June 16, 2009
Decided: August 6, 2009
Amended: August 20, 2009)

Docket Nos. 09-0854-cv (L), 09-1164-cv (CON)

IN THE MATTER OF THE APPLICATION OF THE NEW YORK TIMES COMPANY TO UNSEAL WIRETAP &
SEARCH WARRANT MATERIALS

Before: WINTER, CABRANES, and HALL *Circuit Judges.*

The United States appeals from a final order of the United States District Court for the

Southern District of New York (Jed S. Rakoff, *Judge*) granting an application by the New York Times

Company (the "Times") to access sealed wiretap applications relating to the investigation of the

"Emperor's Club," a prostitution ring once patronized by the former Governor of New York, Elliot

Spitzer.  We hold that the Times has not shown "good cause" to unseal wiretap applications, orders,

and related documents pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of

1968, 18 U.S.C. § 2518(8)(b).  We also hold that the Times does not have a First Amendment right to

gain access to wiretap applications.

Reversed.

> DANIEL L. STEIN, Assistant United States Attorney (Lev L.
> Dassin, Acting United States Attorney, and Jesse M.
> Furman, Assistant United States Attorney, *on the brief*),
> Southern District of New York, New York, NY, *for
> Appellant United States of America.*
>
> DAVID E. MCCRAW (Itai Maytal, *on the brief*), The New York
> Times Company, Legal Department, New York, NY, *for
> Appellee the New York Times Company.*

Marc Falcone (Michelle Hirshman and James L. Brochin, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Movant and Amicus Curiae Elliot Spitzer*.

José A. Cabranes, *Circuit Judge*:

The United States appeals from a final order of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) granting an application by The New York Times Company (the "Times") to gain access to sealed wiretap applications relating to the investigation of the "Emperor's Club," a prostitution ring once patronized by the former Governor of New York, Elliot Spitzer. This appeal raises two questions: (1) Does Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(8)(b) ("Title III")—which permits disclosure of wiretap applications, orders, and related documents only upon a showing of "good cause"—allow disclosure of those types of documents based solely on the news media's interest in publishing the information contained in those documents? (2) Do the news media have a common law or First Amendment right to gain access to wiretap applications that overrides any statutory requirement of good cause for access?

## BACKGROUND

The underlying facts of the case are not in dispute. In March 2008, the government charged four people with running a prostitution ring called the "Emperor's Club." Soon after, the news media identified Governor Spitzer as a client of the ring; Spitzer resigned his office within days. Attached to the government's criminal complaint was an affidavit signed by a Special Agent of the Federal Bureau of Investigation setting forth evidence in support of the charges against the four defendants, including evidence obtained pursuant to wiretaps on cellular telephones used in connection with the prostitution ring. The four people charged as a result of the Emperor's Club investigation all waived indictment

2

and pleaded guilty without requesting or receiving discovery.

The wiretaps used in the Emperor's Club investigation were obtained pursuant to orders entered by several judges of the Southern District of New York pursuant to the provisions of Title III. Under that statute, each wiretap application[1] and order was placed under judicial seal and, at the direction of the issuing district judge, held by the United States Attorney's Office for the Southern District of New York for safekeeping. *See* 18 U.S.C. § 2518(8)(b) (requiring that wiretap materials be placed under judicial seal). In the ordinary course, wiretap orders and applications are unsealed during criminal proceedings or discovery. *See* 18 U.S.C. § 2518(9) (requiring disclosure of a wiretap application and order to a party before intercepted communications may be used against the party in court). However, because the four people charged in the criminal complaint waived indictment and pleaded guilty in the late spring and summer of 2008, the wiretap materials remained under seal.

In December 2008, the Times submitted an application to the District Court to unseal the government's wiretap and search warrant applications in the Emperor's Club investigation. The Times claimed (1) a common law right of access to judicial records, and (2) a First Amendment right of access to the records. The government agreed to disclose the *search warrant* applications, but opposed unsealing *wiretap* materials on the ground that disclosure was prohibited by Title III. Specifically, the government argued that Title III only permitted disclosure of sealed *wiretap* applications for "good cause," and that a general journalistic interest in information did not constitute "good cause" under

---

[1] The District Court summarized the contents of the wiretap application materials as follows:

> In the case of the two wiretaps, the initial applications were supported by affidavits setting forth the evidence that established the prerequisites for the taps, and the requests for renewal were supported by interim reports detailing information that had been learned thus far and the reasons for further monitoring.

*In re N.Y. Times Co.*, 600 F. Supp. 2d 504, 505 (S.D.N.Y. 2009).

Title III. *See* 18 U.S.C. § 2518(8)(b) ("Applications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed *only upon a showing of good cause* before a judge of competent jurisdiction . . . ." (emphasis added)).

The District Court heard argument on the Times's application on January 27, 2009. The Times agreed at the hearing that the Government could "redact[ ] the names and identifying information of all customers" whose names appear in the materials. Accordingly, the District Court ruled that "[t]he scope of the motion was . . . limited to seeking the release of the wiretap materials so redacted." *In re N.Y. Times Co.*, 600 F. Supp. 2d 504, 506-07 (S.D.N.Y. 2009). In a February 19, 2009 Opinion and Order, the District Court granted the Times's application to unseal the wiretap applications as redacted to protect the identities of Emperor's Club clients. *Id.* The District Court offered four reasons for its decision.

First, the District Court concluded that the wiretap applications were "judicial records" because they are "relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 507 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*") (setting forth the definition of "judicial records," and applying that definition to a sealed investigation report regarding labor union corruption)).

Second, the District Court held that at common law and under the First Amendment, the press enjoyed a "right of access" to judicial records, amounting to a "presumption in favor of disclosure." *In re N.Y. Times Co.*, 600 F. Supp. 2d at 507. The District Court reasoned that this presumption reached its zenith "when, as here, the documents are directly relevant to the exercise of a court's Article III judicial power." *Id.* (citing *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("*Amodeo II*") ("[T]he weight to be given the presumption of access must be governed by the role of the material at

4

issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.")).

Third, the District Court balanced the asserted strong presumption in favor of disclosure of judicial records against the government's interest in maintaining confidentiality and protecting privacy. In this case, the District Court concluded (1) there was no longer any concern about confidentiality because the investigation had concluded, and (2) any concerns about privacy could be mitigated through redactions. *In re N.Y. Times Co.*, 600 F. Supp. 2d at 508. Because the asserted strong presumption in favor of disclosure outweighed the government's interests, the Court granted the Times's application. *Id.*

Fourth and finally, the District Court rejected the government's argument that Title III's "good cause" requirement created a statutory presumption *against* disclosure. Under the government's definition, "good cause" requires a "need for disclosure" and an "aggrieved person," and is not satisfied by mere journalistic interest or curiosity. In the District Court's view, "there is no reason to believe that Congress intended 'good cause' to be anything other than a synonym for the balancing dictated by the aforementioned constitutional and common law principles." *In re N.Y. Times Co.*, 600 F. Supp. 2d at 508.

This appeal followed. Before this Court, the government renews its argument that (1) the text, context, and legislative history of Title III create a strong presumption *against* disclosure of wiretap applications, which may be overcome only upon a showing of "good cause," and (2) "good cause" means, essentially, necessity. The Times responds that (1) the District Court applied the correct definition of "good cause" (as incorporating the common law presumption *in favor* of disclosure of judicial materials), and (2) even if Title III has a more restrictive meaning of "good cause," the statute is trumped by the news media's First Amendment right of access to judicial records.

5

**DISCUSSION**

**A.  Standard of Review**

Because the District Court's February 19, 2009 Opinion and Order involved solely a question of law, we review that decision *de novo*.  *See, e.g.*, *Williams v. Beemiller, Inc.*, 527 F.3d 259, 264 (2d Cir. 2008).

**B.  Title III**

It is undisputed by the parties that there is a qualified common law "right to inspect and copy public records and documents, including judicial records and documents," which courts administer by balancing the government's interest in confidentiality and privacy against the public's interest in inspection.  *Nixon v. Warner Communications*, 435 U.S. 589, 597 (1978) (footnote omitted).  We assume *arguendo* that wiretap applications are (a) judicial records and (b) included in this qualified common law right of access, and turn our attention to Title III, which supersedes any arguable common law right. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 313-14 (1981) ("[F]ederal common law . . . is resorted to [only] in absence of an applicable Act of Congress." (internal citations, quotation marks, and alteration marks omitted)).  Title III provides, in relevant part:

> [Wiretap a]pplications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs.  Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

18 U.S.C. § 2518(8)(b).

Instead of beginning with the statute, the District Court considered principally the contours of the common law and First Amendment rights of access to judicial records, and then interpreted Title III's "good cause" requirement in a manner consistent with the perceived rights.  *See In re N.Y. Times Co.*, 600 F. Supp. 2d at 508 ("[T]here is no reason to believe that Congress intended 'good cause' to be

6

anything other than a synonym for the balancing dictated by the aforementioned constitutional and common law principles."). However, where there is a statute on point, we begin our consideration there. In construing the text of any federal statute, we first consider the precedents that bind us as an intermediate appellate court, which provide definitive interpretations of otherwise ambiguous language. Insofar as those precedents fail to resolve an apparent ambiguity, we examine the text of the statute itself, interpreting provisions in light of their ordinary meaning and their contextual setting. *See United States v. Magassouba*, 544 F.3d 387, 404 (2d Cir. 2008) ("In determining whether statutory language is ambiguous, we 'reference . . . the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))). Where the statutory language remains ambiguous, "we resort to canons of construction and, if the meaning still remains ambiguous, to legislative history." *Magassouba*, 544 F.3d at 404 (internal alterations and quotation marks omitted).

The central question of statutory interpretation in this case is the meaning of "good cause" within the context of Title III. Congress did not define the term, and we are aware of no Supreme Court case that has done so. However, our Court concluded a quarter-century ago that "good cause" could be found where the applicant seeking to unseal wiretap applications was an "aggrieved person," but not upon any lesser showing. *See Nat'l Broadcasting Co. v. U.S. Dep't of Justice*, 735 F.2d 51, 55 (2d Cir. 1984) ("*NBC*") (also noting that NBC had not demonstrated a need for the materials). In that case, the National Broadcasting Company, Inc. ("NBC") appealed a decision by Chief Judge T.F. Gilroy Daly of the United States District Court for the District of Connecticut, denying NBC's application to unseal wiretap applications for lack of "good cause." NBC argued that it satisfied Title III's "good cause" requirement because "it ha[d] shown a need for disclosure [in that] the materials will certainly lead to

7

discovery of admissible evidence in [that] libel action."[2]  *Id.* (quotation marks omitted).

We observed that Congress enacted Title III in the wake of *Katz v. United States*, 389 U.S. 347, 353, 355-56 (1967), which held that, absent prior authorization by a court, wiretapping violated the Fourth Amendment's prohibition against unreasonable search and seizure.  *See NBC*, 735 F.2d at 53. We further commented that, in light of the Supreme Court's concerns about privacy, Title III created a strong presumption *against* disclosure of the fruits of wiretap applications.  *See id.* (citing 18 U.S.C. § 2515 ("[N]o part of the contents of [intercepted] communication and no evidence derived therefrom may be received in evidence in any trial, hearing or other proceeding in or before any court  . . . if the disclosure of that information would be in violation of this chapter.")).  Chief Judge Feinberg addressed the argument of NBC that "it is somehow unseemly that only the government can take advantage of wiretaps." *Id.* at 54.  "This argument," he concluded, "does not have much force." *Id.*  He explained: "Under Title III, with few exceptions not here relevant, no one other than the government can lawfully engage in wiretapping and it therefore is not so unusual that only the government can enjoy its fruits." *Id.*  Accordingly, we concluded that "turning Title III into a general civil discovery mechanism would simply ignore the privacy rights of those whose conversations are overheard.  We agree with the government that this was not the intention of Congress."  *NBC*, 735 F.2d at 54.

Turning to NBC's request to disclose wiretap *applications*, as opposed to the fruits of wiretap

---

[2] The underlying libel action was filed by Wayne Newton against NBC after three television news broadcasts linked Newton to Guido Penosi and Frank Piccolo, who were allegedly involved in organized crime.  As Chief Judge Feinberg explained:

> The October 1980 broadcast stated that Newton had called Penosi for help with "a problem" and that the latter had contacted another "mob boss", Frank Piccolo, to solve the problem.  The broadcast reported, among other things, that Piccolo had "taken care of Newton's problem, and had become a hidden partner in the Aladdin hotel deal."

*NBC*, 735 F.2d at 52.

surveillance, we concluded that 18 U.S.C. § 2518(8)(b) reflected the same presumption *against*

disclosure.[3] "[W]e believe that Congress also did not intend this section to be used as an avenue for

discovery by all private litigants in civil cases, unless they are directly aggrieved by a wiretap." *Id.* at 55.

We reached this conclusion regarding wiretap applications relying, in part, on the legislative history of

Title III:

> [T]he Senate Report on the 1968 enactment of Title III states that "applications and orders for authorization shall be treated confidentially. . . . [They] may not be disclosed except incidental to the disclosure or use of the records themselves after showing of good cause, for example, under [subsection] (10)(a). . . ." S. Rep. No. 1097, [90th Cong., 2d Sess. 67], at 105, [reprinted in] 1968 U.S. Code Cong. & Ad. News [2112,] 2194. Subsection (10)(a) provides for standing for an "aggrieved person" to move to suppress "the contents of any intercepted wire or oral communication . . . or evidence derived therefrom. . . ."

---

[3] We note that the plain language of the statute indicates that there is a categorical presumption *against* disclosure of sealed wiretap applications. *See* 18 U.S.C. § 2518(8)(b) (permitting disclosure of sealed wiretap applications "*only* upon a showing of good cause" (emphasis added)).

Because of the plain language of the statute, our holding in *In re Application of Newsday, Inc.*, 895 F.2d 74 (2d Cir. 1990) ("*Newsday*"), is not relevant to this case, despite the Times's suggestion to the contrary. In that case, we concluded that a different provision of Title III, 18 U.S.C. § 2517, did not directly prohibit a right of access to information obtained with a wiretap that was then placed in a search warrant application. *Id.* at 75. It was only after we determined that that provision of the statute did not prohibit this right of access that we began our inquiry into the right of access under the common law. *Id.* at 76-78 ("[Title III] does not . . . address the issue of public access to intercepted communications when those communications become part of a public document."). Because the statute did not directly address the question presented there, we applied common law principles to determine if Newsday had a right of access. *Id.* The statute at issue in the instant case, 18 U.S.C. § 2518(8)(b), on the other hand, clearly establishes a presumption against disclosure by permitting the disclosure of sealed wiretap applications "*only* upon a showing of good cause," *id.*, and therefore there is no occasion for us to consider or apply the common law.

Although this difference is sufficient to distinguish *Newsday* from this case, the cases differ in other important respects. Importantly, Newsday sought the *fruits* of a wiretap, which were included in an application for a search warrant—a public document. *Newsday*, 895 F.2d at 75. Here, the Times seeks the wiretap *applications* themselves—documents which have never been public. Additionally, in *Newsday*, the government did not object to unsealing the documents, *id.*, whereas here the government—the only party that "can lawfully engage in wiretapping [thus making] it . . . not so unusual that only the government can enjoy its fruits," *NBC*, 735 F.3d at 54—does object. Again, though the express terms of § 2518 are sufficient to distinguish this case from *Newsday*, it is worth noting that the two cases also differ in these important respects.

9

*Id.* NBC was not an "aggrieved person" because, according to the express terms of Title III, it was not "'a party to any intercepted wire or oral communication or a person against whom the interception was directed.'" *Id.* (quoting 18 U.S.C. § 2510(11) (defining "aggrieved person")).

We further agreed with the District Court that, in addition to not having any claim as an "aggrieved person," NBC had not even made the lesser showing that they had any need for the materials. *NBC*, 735 F.2d at 55 ("In any event, NBC has not shown why it cannot defend its broadcasts . . . without the sealed material, through the information it has in its own files and through the sources that were available to it at the time it prepared the news stories at issue . . . ."). Under the statute, one must show "good cause," which "means that, at least minimally, there must be a need for disclosure." *In re Applications of Kansas City Star*, 666 F.2d 1168, 1176 (8th Cir. 1981). If, after all, a party does not have a need for the materials, then there is no good cause to disclose them. In *NBC*, we further refined the required showing of "good cause" by requiring that the party claiming access be an "aggrieved person." *NBC*, 735 F.2d at 55. In our Circuit, then, the required showing that a claimant be an "aggrieved person" assumes that there has been a showing of need. Because NBC was not an aggrieved person under the statute, showing need was irrelevant—they still could not gain access to the wiretap applications. *Id.* Nonetheless, our passing reference to the fact that NBC had not demonstrated need buttressed the argument that it was not an "aggrieved person" in either the statutory or colloquial sense. Accordingly, we held that, in that context, NBC had not shown "good cause" for unsealing the wiretap applications. *Id.*

The Times argues that, unlike NBC, it is not a civil litigant, and therefore the reasoning in *NBC* does not apply. Rather, the Times posits that, unlike a "private litigant," it has a "public interest in the materials or the common law or First Amendment right of access" to them. Appellee's Br. 14-15. However, we see no reason why our analysis in *NBC* that Title III's "good cause" requirement

10

demands a showing of an "aggrieved person" should not also apply to the instant case. It is irrelevant for the purposes of Title III that the Times is a newspaper investigating a matter of public importance. Like NBC, the Times does not suggest, much less show, that it is an "aggrieved person" within the express terms of the statute—that is, like NBC, the Times does not claim to be "a party to any intercepted wire or oral communication or a person against whom the interception was directed." *NBC*, 735 F.2d at 55 (quoting 18 U.S.C. § 2510(11)).

The Times further asserts that Title III cannot be read to supplant or forbid entirely the pre-existing common law right to access judicial records unless the statute's intent to abrogate the common law rule is "evident." Appellee's Br. 13. In the Times's view, the District Court properly interpreted Title III to be consistent with the common law presumption in favor of disclosure. However, our decision in *NBC*, which is a binding precedent of our Court, precludes this interpretation. In that case, we concluded that the structure and purpose of Title III—including the provision governing disclosure of wiretap applications—revealed a manifest congressional intent that wiretap applications be treated confidentially and clearly negated a presumption in favor of disclosure.

For all of these reasons, we conclude that the Times has not demonstrated "good cause" under Title III to unseal the wiretap applications authorized as part of the government's investigation of the Emperor's Club.

## C. First Amendment Right of Access

We turn now to the second question presented: Do the news media have a First Amendment right to gain access to wiretap applications that overrides any statutory requirement for access? The government argues that its interpretation of Title III is consistent with the First Amendment because there is only a "qualified" constitutional right of access to judicial records, and that right does not extend to wiretap applications. The Times replies that, although this Court has not decided whether a

11

First Amendment right of access applies to wiretap applications, similar documents—such as sealed documents in a summary judgment motion and sealed dockets—are subject to the public's constitutional right to inspect judicial records. *See, e.g.*, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120, 124 (2d Cir. 2006) (acknowledging a "qualified First Amendment right to attend judicial proceedings and to access certain judicial documents," and extending that right to "documents submitted to [a] court in connection with a summary judgment motion"); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004) (recognizing the existence of a qualified First Amendment right of access to sealed docket sheets of state courts). The Times also notes that at least one other Circuit has held that there is a First Amendment right of access to documents filed in support of *search warrant* applications, although that decision did not consider access to the warrant applications themselves. *See In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988).

We have previously endorsed two approaches to determine whether the First Amendment right of access extends to particular judicial records. First, the public has a right to gain access to judicial records (1) that "have historically been open to the press and general public," and (2) where "public access plays a significant positive role in the functioning of the particular process in question." *Hartford Courant Co.*, 380 F.3d at 92 (citing *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986) ("If the particular proceeding in question passes these tests of experience and logic, a *qualified* First Amendment right of public access attaches." (emphasis added)). Second, we have held that the First Amendment protects access to judicial records that are "derived from or a necessary corollary of the capacity to attend the relevant proceedings." *Hartford Courant Co.*, 380 F.3d at 93; *see also United States v. Suarez*, 880 F.2d 626, 630-31 (2d Cir. 1989) (explaining that the qualified First Amendment right of access applies to "documents filed in connection with criminal proceedings").

Regarding the first approach, the government argues that the Times cannot satisfy the

requirements of either (1) history or (2) logic (*i.e.*, public policy).  In the government's view, wiretap applications are a creature of statute and only came into existence in 1968, when Title III was enacted in the aftermath of *Katz v. United States*, 389 U.S. 347.  In addition, Congress expressly crafted the wiretap provisions of Title III to ensure confidentiality and privacy, indicating that public policy is served by less disclosure rather than greater disclosure.

Regarding the second approach, which derives a right of access to documents from a right to attend judicial proceedings, the government argues that because wiretap applications are presented to a district judge *ex parte* and *in camera*, and there is no public right to attend the relevant proceedings, there is no public right to gain access to the documents produced at those proceedings.

The Times responds that the "history and logic" requirements are satisfied in the instant case. Wiretap applications, the Times claims, are merely judicial records that, like search warrants or docket sheets, have been historically open to public access.  *See* Appellee's Br. 6-7; *see also Hartford Courant Co.*, 380 F.3d at 93 (deriving "historical support for the public availability of certain judicial documents in the American common law heritage" of access to judicial records).  In addition, the Times argues that public policy weighs in favor of monitoring the government's intrusions on personal privacy and the role of the courts in acquiescing to the government's requests.  *See* Appellee's Br. 15-17, 24-26.  The Times does not address the second approach identified by the courts, which conditions access to judicial documents on access to the relevant judicial proceedings.  *See Hartford Courant Co.*, 380 F.3d at 93 (explaining the attendance-at-judicial-proceedings rationale for recognizing a First Amendment right).

In our view, both approaches to a consideration of the First Amendment question presented here favor the government.  Wiretap applications were created in 1968 in response to a Supreme Court decision that prohibited the use of electronic surveillance at the sole discretion of law enforcement.  *See*

13

*Katz v. United States*, 389 U.S. at 355-56. Although wiretaps themselves pre-date wiretap applications, the introduction of wiretap applications is a more modern invention and, since the time of their creation in Title III, have been subject to a statutory presumption *against* disclosure. Accordingly, we conclude that these wiretap applications have not historically been open to the press and general public. In addition, the Times does not present a good reason why its preferred public policy ("logic")—monitoring the government's use of wiretaps and potential prosecutions of public officials—is more compelling than Congress's concern for confidentiality and privacy, which are reflected in the text of Title III and in its legislative history. *See NBC*, 735 F.2d at 54-55. Accordingly, the first approach to the First Amendment question—the "history and logic" analysis—weighs in favor of not recognizing a First Amendment right of access to wiretap applications. *See Hartford Courant Co.*, 380 F.3d at 92 (requiring "both 'logic' *and* 'experience' in establishing the public's and press's qualified First Amendment right of access" (emphasis added)).

Regarding the second approach—based on attendance at proceedings—there is no question that the public and the press are not permitted to attend the *ex parte*, *in camera* proceedings where wiretap applications are presented to a district judge. As we have explained this second approach, "the media's and public's qualified right of access to judicial documents [is] derived from or a necessary corollary of the capacity to attend the relevant proceedings," so that "the right to inspect documents derives from the public nature of particular tribunals." *Hartford Courant Co.*, 380 F.3d at 93. In this case, there is no First Amendment right of access under the attendance-at-judicial-proceedings approach because the relevant proceedings—*ex parte*, like grand jury presentations, and before a district judge *in camera*—are not public.[4]

---

[4] Nonpublic proceedings are common throughout the judiciary. Although most court proceedings are public, *see, e.g*, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980) ("The right of access to places traditionally open to the public, as criminal trials have long been, may be

14

In sum, under either the "history and logic" or public attendance approach, the Times does not enjoy a First Amendment right of access to wiretap applications sealed under 18 U.S.C. § 2518(8)(b).

**CONCLUSION**

For the foregoing reasons, we REVERSE the February 19, 2009 order of the District Court and enter judgment for the government.

---

seen as assured by the amalgam of the First Amendment guarantees of speech and press . . . ."), this right of public access to criminal proceedings is not absolute. *Id.* at 581 n.18 ("[A] trial judge [may], in the interest of the fair administration of justice, impose reasonable limitations on access to a trial."). Criminal trials, furthermore, are not the only proceedings that may be nonpublic in part. An array of proceedings may be nonpublic when, and to the extent, circumstances warrant secrecy. All grand jury proceedings, for example, traditionally have been nonpublic. *See, e.g.*, Fed. R. Crim. P. 6(d)-(e) (providing that only "[t]he following persons may be present while the grand jury is in session: attorneys for the government, the witness being questioned, interpreters when needed, and a court reporter or operator of a recording device" and imposing a general rule that grand jury proceedings be kept secret); *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979) ("We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."). It is worth noting that attempting to contact or influence a grand or petit juror constitutes a crime. *See* 18 U.S.C. § 1503 (criminalizing attempting to contact or influence a juror); *see also* 18 U.S.C. § 1504 (declaring that attempting to contact a juror in writing is a separate crime). Similarly, other proceedings may be nonpublic under certain circumstances, including protecting a defendant's right to a fair trial. *See, e.g.*, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986) (describing circumstances under which proceedings may be nonpublic). When litigation requires disclosure of trade secrets, the court may disclose certain materials only to the attorneys involved. *See* Fed. R. Civ. P. 26(c)(1)(G) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way . . . ."). In other sensitive situations, some materials, including the names of the parties, may be under judicial seal. *See generally In re Richard Roe, Inc.*, 68 F.3d 38, 39 n.1 (2d Cir. 1995) (employing the pseudonym "Richard Roe" because name of party is under seal). Finally, judges may review other forms of sensitive information *in camera* and *ex parte*. To protect confidential information or sensitive evidence, for example, a judge may ask one party to appear *ex parte* to submit the evidence for *in camera* review before the judge returns the evidence to the party. *See, e.g.*, *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003) (describing the presentation of documents for in camera review as a "practice both long-standing and routine in cases involving claims of privilege" and citing illustrative cases). In these various proceedings, the courts seek to balance the need for transparency in the judiciary with the effective protection of sensitive information.