Filed:  April 5, 2011

UNITED STATES COURT OF APPEALS
                       FOR THE FOURTH CIRCUIT
                    _____

                           No. 09-2086
                      (1:09-cv-00042-LO-TRJ)
                    _____

AMERICAN  CIVIL  LIBERTIES  UNION;  OMB  WATCH;  GOVERNMENT
ACCOUNTABILITY PROJECT,

              Plaintiffs - Appellants,

         v.

ERIC  H.  HOLDER,  JR.,  in  his  official  capacity  as  Attorney
General  of  the  United  States;  FERNANDO  GALINDO,  in  his
official  capacity  as  Clerk  of  the  Court  in  the  United  States
District Court, Eastern District of Virginia,

              Defendants – Appellees.

--------------------------------------

TAXPAYERS AGAINST FRAUD EDUCATION FUND,

              Amicus Supporting Appellees.

                    _____

                           O R D E R
                    _____

         The  Court  amends  its  opinion  filed  March  28,  2011,  as

follows:

         On  page  2,  attorney  information  section,  line  12,  the

name "J. Mark Vezina" is corrected to read "J. Marc Vezina."


                              For the Court – By Direction

                              /s/ Patricia S. Connor
                                       Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMERICAN CIVIL LIBERTIES UNION;
OMB WATCH; GOVERNMENT
ACCOUNTABILITY PROJECT,

   *Plaintiffs-Appellants,*

   v.

ERIC H. HOLDER, JR., in his official
capacity as Attorney General of
the United States; FERNANDO
GALINDO, in his official capacity as
Clerk of the Court in the United
States District Court, Eastern
District of Virginia,

   *Defendants-Appellees.*

⎫
⎬  No. 09-2086
⎭

TAXPAYERS AGAINST FRAUD
EDUCATION FUND,

   *Amicus Supporting Appellees.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Liam O'Grady, District Judge.
(1:09-cv-00042-LO-TRJ)

Argued: September 21, 2010

Decided: March 28, 2011

Before GREGORY and KEENAN, Circuit Judges,
and James C. DEVER III, United States District Judge for
the Eastern District of North Carolina,
sitting by designation.

Affirmed by published opinion. Judge Dever wrote the majority opinion, in which Judge Keenan joined. Judge Gregory wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Christopher A. Hansen, AMERICAN CIVIL LIBERTIES UNION, New York, New York, for Appellants. Eric Fleisig-Greene, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Ben Wizner, Benjamin Sahl, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Appellants. Tony West, Assistant Attorney General, Douglas N. Letter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellees. J. Marc Vezina, VEZINA & GATTUSO, LLC, Gretna, Louisiana; Joseph E. B. White, Cleveland Lawrence, III, TAXPAYERS AGAINST FRAUD EDUCATION FUND, Washington, D.C.; Zachary A. Kitts, COOK & KITTS, PLLC, Fairfax, Virginia, for Amicus Supporting Appellees.

---

## OPINION

DEVER, District Judge:

From 1860 to 1863, the federal budget grew dramatically due to spending associated with the Civil War. Sadly, some unscrupulous people viewed the growing federal budget as a font to be plundered. Congress held hearings and learned that federal treasure had been spent on decrepit horses and mules, weapons that would not fire, rancid rations, and phantom supplies. In response, in 1863, Congress enacted the False Claims

Act ("FCA"). When enacted, the Department of Justice did not exist, and federal law enforcement fell to Attorney General Edward Bates and his staff in Washington, D.C., as well as to the then-independent U.S. Attorneys in each federal judicial district. In enacting the FCA, Congress included qui tam provisions authorizing private citizens (known as qui tam relators) to use the FCA to file suit on behalf of the United States and to share in any recovery from the fraudsters.

Although the FCA proved a somewhat useful tool for returning ill-gotten gains to the United States Treasury, courts issued a number of rulings narrowing the construction of the FCA. Thus, in 1986, Congress amended the FCA in order to revise and strengthen it, particularly the FCA's qui tam provisions. Since the 1986 Amendments, relators have filed a dramatically larger number of qui tam actions, and due in large measure to qui tam actions, the Department of Justice has used the FCA to return over $27 billion to the United States Treasury.

In this case, the American Civil Liberties Union ("ACLU"), OMB Watch, and Government Accountability Project ("GAP") (collectively "appellants") filed a complaint seeking declaratory and injunctive relief against the Attorney General of the United States and the Clerk of Court for the United States District Court of the Eastern District of Virginia (collectively "appellees"). Appellants make a facial constitutional challenge to the seal provisions in 31 U.S.C. § 3730(b)(2)–(3) of the FCA, alleging that the seal provisions violate the public's First Amendment right of access to judicial proceedings, violate the First Amendment by gagging qui tam relators from speaking about their qui tam complaints, and infringe on a court's inherent authority to decide on a case-by-case basis whether a particular qui tam complaint should be sealed and thereby violate the separation of powers. Congress added the FCA's seal provisions in 1986, and the seal provisions require a qui tam relator to file the qui tam complaint under seal and mandate that the complaint remain sealed for 60 days.

Accordingly, when a qui tam relator files a qui tam action, the Clerk of Court seals the qui tam complaint and the docket sheet reflecting the sealed complaint. During this 60-day period, the United States investigates the fraud allegations and decides whether to intervene in the action. At the end of the 60-day period, the United States either intervenes, declines to intervene, or seeks additional time from the federal court to investigate the allegations. If it intervenes or declines to intervene, the qui tam complaint and docket sheet are unsealed. If the United States needs more time to investigate the allegations to decide whether to intervene, the FCA permits the United States to demonstrate good cause in camera to a federal court for continuing the seal beyond 60 days.

The district court rejected appellants' facial constitutional challenge to the FCA's seal provisions and granted appellees' motion to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the FCA's seal provisions do not violate the First Amendment or the separation of powers, we affirm.

I.

In 1863, Congress enacted legislation for the civil recovery of false claims. *See* Act of March 2, 1863, ch. 67, 12 Stat. 696 (1863); S. Rep. No. 99-345, at 8-13 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273-78. Congress targeted the law at contractors who fraudulently obtained money from the War Department during the Civil War. *See United States v. McNinch*, 356 U.S. 595, 599 (1958). "Testimony before the Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war. Congress wanted to stop this plundering of the public treasury." *Id.* (footnotes omitted). Initially, the act included both criminal and civil penalties. *See* Act of March 2, 1863, ch. 67, 12 Stat. 696-98 §§ 1-3 (1863).

Congress eventually split the legislation concerning false claims into separate civil and criminal false claims statutes. *See United States v. Bornstein*, 423 U.S. 303, 305 n.1 (1976). From its inception, the FCA contained provisions permitting a party known as a qui tam relator to bring suit in the name of the United States. *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 540 (1943).[1] If the qui tam relator prevailed in the suit, the qui tam relator recovered a portion of the proceeds. *See id.* Statutory qui tam provisions create a financial incentive for relators to protect the federal treasury from fraud. *See id.* As Judge Hall once wrote for this court: such provisions "let loose a posse of ad hoc deputies to uncover and prosecute frauds against the government" and thereby supplement the government's "regular troops." *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992).

In 1986, following congressional hearings concerning fraud in government contracting, Congress enacted the False Claims Amendment Act of 1986 ("1986 Amendments"). *See Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 342–43 (4th Cir. 2010); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784–86 (4th Cir. 1999). The 1986 Amendments expanded the FCA's scope, increased the penalties, lowered the requisite standard of knowledge and intent, revised the process for a qui tam relator to file suit, and expanded the number of qui tam relators permitted to sue. *See United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728–29, 734 (4th Cir. 2010); *United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 292 (4th Cir. 2008).

---

[1]"Qui tam" is short for "qui tam pro domino rege quam pro se ipso in hac parte sequitor," which means "who pursues this action on our Lord the King's behalf as well as his own." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000); *see Hess*, 317 U.S. at 541 n.4.

The FCA provides that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

violates the FCA. 31 U.S.C. § 3729(a)(1); *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 349 (4th Cir. 2009). In order to recover under the FCA, the United States must prove by a preponderance of the evidence that the person knowingly violated the FCA. 31 U.S.C. § 3731(d). The FCA defines knowingly and expressly rejects that a person have a specific intent to defraud. *Id.* § 3729(b). A person who violates the FCA is liable to the United States for a civil penalty of not less than $5,000, but no more than $10,000 per false claim, regardless of whether the United States sustained damages. *See id.* § 3729(a)(1).[2] If the United States can prove that the false claim caused it damages, then it may recover between double and treble damages. *See id.* § 3729(a). Additionally, if it prevails, the United States may recover the costs of the civil action brought to recover any penalty or damages. *See id.*

In 1986, Congress also substantially revised the FCA's qui tam provisions in order "to encourage more private enforcement suits." S. Rep. No. 99-345, at 23–24 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5288-89. Under the qui tam provisions, Congress mandated that a relator file the qui tam complaint under seal in a federal district court. *See* 31 U.S.C. § 3730(b). Specifically, 31 U.S.C. § 3730(b)(2)–(3) states:

> (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4[(i)][3] of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to inter-

---

[2]*Cf.* Civil Monetary Penalties Inflation Adjustment, 64 Fed. Reg. 47099 (Aug. 30, 1999); 28 C.F.R. § 85.3(9) (2010).

[3]The 1993 Amendments to the Federal Rules of Civil Procedure moved former Rule 4(d)(4) to current Rule 4(i). *Compare* Fed. R. Civ. P. 4(d)(4) (1992) *with* Fed. R. Civ. P. 4(i) (2010).

> vene and proceed with the action within 60 days
> after it receives both the complaint and the material
> evidence and information.
>
> (3) The Government may, for good cause shown,
> move the court for extensions of the time during
> which the complaint remains under seal under para-
> graph (2). Any such motions may be supported by
> affidavits or other submissions in camera. The defen-
> dant shall not be required to respond to any com-
> plaint filed under this section until 20 days after the
> complaint is unsealed and served upon the defendant
> pursuant to Rule 4 of the Federal Rules of Civil Pro-
> cedure.

*Id.* § 3730(b)(2)-(3). A qui tam relator must file the complaint under seal and the complaint must remain sealed for at least 60 days. *Id.* § 3730(b)(2). This initial seal provision and 60-day period are mandatory. *See id.* Congress adopted the 60-day period for numerous reasons: (1) to permit the United States to determine whether it already was investigating the fraud allegations (either criminally or civilly); (2) to permit the United States to investigate the allegations to decide whether to intervene; (3) to prevent an alleged fraudster from being tipped off about an investigation; and, (4) to protect the reputation of a defendant in that the defendant is named in a fraud action brought in the name of the United States, but the United States has not yet decided whether to intervene. *See* S. Rep. No. 99-345, at 24–25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289–90; *Under Seal v. Under Seal*, 326 F.3d 479, 486 (4th Cir. 2003); *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998–99 (2d Cir. 1995).

Sometimes the United States is aware of the alleged fraud described in a qui tam complaint. Sometimes it is not. Either way, upon receiving a qui tam complaint, the Department of Justice's investigation usually requires Department of Justice personnel to consult with investigators within the Department

of Justice and personnel within the federal agency that is the alleged fraud victim. The seal provisions provide time for such consultation and investigation so that the United States may make an informed decision about whether to intervene in the qui tam action. The seal provisions also allow the government an opportunity to determine whether the qui tam action implicates any ongoing civil or criminal fraud investigations and to determine whether to request a stay of the action pursuant to 31 U.S.C. § 3730(c)(4). *See* S. Rep. No. 99-345, at 24 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289. Because Congress recognized that some investigations might require more than 60 days, the 1986 Amendments permit the United States, "for good cause shown," to file a motion in camera with affidavits or other submissions to extend the seal. *See* 31 U.S.C. § 3730(b)(3). The United States must file such a motion before the 60-day period expires. *Id.* At that point, a federal court must review the motion and determine whether to extend the seal. *See id.* If the court decides to extend the seal, the qui tam complaint, the docket sheet, the government's in camera submission, and the order extending the seal all remain sealed. *See generally United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1341–42, 1345–46 (4th Cir. 1994). If the court declines to extend the seal, the above-referenced items are unsealed. *See*, *e.g.*, *Under Seal*, 326 F.3d at 486; *United States ex rel. Doe v. X Corp.*, 862 F. Supp. 1502, 1510–11 (E.D. Va. 1994).

At the conclusion of its investigation, the United States decides whether to intervene in the qui tam action. If the United States intervenes, it notifies the court and the qui tam relator, and the United States takes over the litigation. Following intervention, the complaint is unsealed, the docket is unsealed, and the United States serves the complaint on the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure. At that point, the United States may amend the complaint, move to dismiss the action or certain claims, seek to settle the action, pursue the claims through alternative remedies, or litigate the action. *See* 31 U.S.C. §§ 3730(b)(1),

3730(c)(2)(A) (discussing dismissal); *id.* § 3730(c)(2)(B) (discussing settlement); *id.* § 3730(c)(5) (discussing alternative administrative false claims remedies).

If the United States intervenes, the qui tam relator remains a party to the action. *See id.* § 3730(c)(1). Thus, the qui tam relator may participate in discovery, engage in motions practice, and participate at trial. The United States may seek to curb a qui tam relator's participation if such participation is repetitious, irrelevant, or harassing. *See id.* § 3730(c)(2)(C). Likewise, the United States may seek to curb civil discovery in a qui tam action if such discovery will interfere with ongoing civil or criminal investigation arising from the same facts. *Id.* § 3730(c)(4). Moreover, a defendant may seek to limit a qui tam relator's participation in the litigation. *See id.* § 3730(c)(2)(D).

If the United States intervenes and recovers any proceeds under the FCA, the relator receives at least 15 percent but not more than 25 percent of the proceeds. *See id.* § 3730(d)(1). Additionally, the relator may recover its reasonable expenses, attorney's fees, and costs. *See id.*

The process and potential recovery are different if the United States declines to intervene. If the United States declines to intervene, it notifies the court and the qui tam relator. The complaint is then unsealed, the docket is unsealed, and the qui tam relator serves the complaint on the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure. The qui tam relator then litigates the case against the defendant. The United States may, however, continue to receive all pleadings and seek to intervene at a later date for good cause. *See id.* § 3730(c)(3). Furthermore, the United States may seek to curb civil discovery for a period of up to 60 days upon a showing that such discovery would interfere with its investigation or prosecution of a civil or criminal matter arising from the same facts. *Id.* § 3730(c)(4).

If the United States declines to intervene and the qui tam relator recovers proceeds under the FCA, the qui tam relator's proceeds are larger than in a case where the United States intervened. Specifically, if the relator litigates alone and recovers proceeds under the FCA, the relator's share must be at least 25 percent, but no more than 30 percent of the proceeds, plus reasonable expenses, attorney's fees, and costs. *See id.* § 3730(d)(2).[4]

## II.

Appellants contend the seal provisions of 31 U.S.C. § 3730(b)(2)-(3) facially violate the First Amendment and the Constitution's separation of powers. Specifically, appellants contend that the seal provisions violate the public's First Amendment right of access to judicial proceedings, violate the First Amendment by gagging qui tam relators from speaking about their qui tam complaints, and infringe on a court's inherent power to determine on an individualized basis whether a qui tam complaint should be sealed and thereby violate the separation of powers. *ACLU v. Holder*, 652 F. Supp. 2d 654, 659 (E.D. Va. 2009). The district court disagreed and dismissed their complaint. *Id.* at 671. Our review is de novo. *See*, *e.g.*, *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009); *Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006).

---

[4]To say that the 1986 Amendments strengthened the FCA and its qui tam provisions would be an understatement. According to the Department of Justice, it used the FCA to recover more than $3 billion in fiscal year 2010. *See* Dep't of Justice, *False Claims Act Statistics*, 2 (Nov. 23, 2010), http://www.justice.gov/civil/frauds/fcastats.pdf. Moreover, between 1986 and 2010, the Department of Justice used the FCA to recover more than $27 billion. *See id.* at 1–2. Qui tam relators have filed 63% of FCA cases since 1987. *See id.* Most strikingly, qui tam actions accounted for only 8% of FCA matters in 1987, but accounted for 80% of FCA matters in 2010. *See id.*

In 2009, Congress again amended the FCA. *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, sec. 4, 123 Stat. 1617, 1621-25. The 2009 amendments to the FCA are not material to this appeal.

### A.

Initially, the parties dispute whether the First Amendment provides a right of access to a qui tam complaint and docket sheet sealed in accordance with 31 U.S.C. § 3730(b)(2)–(3).[5] We recognize that the First Amendment provides a right of access to criminal trials and certain criminal proceedings. *See*, *e.g.*, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10-14 (1986); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 505–10 (1984); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603–06 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–80 (1980); *In re Washington Post Co.*, 807 F.2d 383, 388–90 (4th Cir. 1986); *see also In re State-Record Co.*, 917 F.2d 124, 127-29 (4th Cir. 1990); *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64–65 (4th Cir. 1989).[6] Although the First Amendment guarantees a right of access to criminal trials and certain criminal proceedings, that right of access is not absolute. *See*, *e.g.*, *Globe Newspaper Co.*, 457 U.S. at 606. Thus, a state may deny access to a portion of a criminal trial if it demonstrates that denial of access is necessitated by a compelling government interest and is narrowly tailored to serve that interest. *Id.* at 606-07. We also recognize that the Supreme Court has not addressed whether the First Amendment's right of access extends to civil trials or other aspects of civil cases. *See*, *e.g.*, *Huminski v. Corsones*, 386 F.3d 116, 145 n.30 (2d Cir. 2004); *Detroit Free Press v. Ash-*

---

[5]Appellants abandoned any argument that the common law provides a right to access by failing to properly raise the issue in their opening brief. *See United States v. Brooks*, 524 F.3d 549, 556 n.11 (4th Cir. 2008); *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999). Thus, we do not address any issues associated with the common-law right of access. *Cf. Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988).

[6]Public access to a criminal trial also raises issues under the public trial clause of the Sixth Amendment. *See*, *e.g.*, *Presley v. Georgia*, 130 S. Ct. 721, 723-25 (2010) (per curiam); *Waller v. Georgia*, 467 U.S. 39, 44-50 (1984). In challenging the FCA's seal provisions, appellants do not rely on the Sixth Amendment.

*croft*, 303 F.3d 681, 695 n.11 (6th Cir. 2002). However, most circuit courts, including the Fourth Circuit, have recognized that the First Amendment right of access extends to civil trials and some civil filings. *See*, *e.g.*, *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575–78 (4th Cir. 2004); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91–92 (2d Cir. 2004); *Stone v. Univ. of Md. Med. Sys. Corp.*, 948 F.2d 128, 130–31 (4th Cir. 1991); *Stone*, 855 F.2d at 180–81; *Rushford v. New Yorker Magazine Inc.*, 846 F.2d 249, 253 (4th Cir. 1988).

Here, we need not and do not resolve whether the First Amendment right of access extends to a qui tam complaint and docket sheet sealed in accordance with 31 U.S.C. § 3730(b)(2)–(3). *Cf. Pearson v. Callahan*, 129 S. Ct. 808, 821 (2009) (noting that lower federal courts should not "pass on questions of constitutionality . . . unless such adjudication is unavoidable" (alteration in original) (quotation omitted)). Instead, we assume without deciding that the First Amendment right of access extends to a qui tam complaint and docket sheet sealed in accordance with 31 U.S.C. § 3730(b)(2)–(3). Even with this assumption, access is still not guaranteed. *See*, *e.g.*, *Globe Newspaper Co.*, 457 U.S. at 606-07; *Stone*, 855 F.2d at 180; *Rushford*, 846 F.2d at 253; *In re Washington Post Co.*, 807 F.2d at 390. Specifically, if the United States can show a compelling interest and the denial of access is narrowly tailored to serve that compelling interest, denial of access in accordance with 31 U.S.C. § 3730(b)(2)–(3) comports with the First Amendment. *See*, *e.g.*, *Globe Newspaper Co.*, 457 U.S. at 606-07; *Stone*, 855 F.2d at 180.

The United States has a compelling interest in protecting the integrity of ongoing fraud investigations. *See*, *e.g.*, *Va. Dep't of State Police*, 386 F.3d at 579. Congress added the seal provisions in the FCA for numerous reasons, including to preserve the integrity of such fraud investigations. *See* S. Rep. No. 99-345, at 24 (1986), *reprinted in* 1986 U.S.C.C.A.N.

5266, 5289; *Pilon*, 60 F.3d at 998-99. Thus, we turn to whether the seal provisions are narrowly tailored to serve that compelling government interest.

The FCA's seal provisions are narrowly tailored in three important ways. First, in attempting to balance the government's investigatory needs against the need for public access to court documents, Congress crafted a detailed process for initiating and pursuing a qui tam complaint under the FCA, including a narrow window of time (i.e., 60 days) in which the seal provisions are mandatory. In doing so, Congress accounted for the complex nature of modern fraud investigations, the government's limited resources, and the unique nature of a qui tam action under the FCA. As for the unique nature of qui tam actions, the Supreme Court explained most recently in *Vermont Agency* that qui tam statutes have a long historical pedigree, but are unique in effecting a partial assignment of a damages claim of the United States to the relator. *See Vt. Agency of Natural Res.*, 529 U.S. at 774-76. Such qui tam statutes implicate the appointments clause in Article II, § 2 and the "take care" clause in Article II, § 3. *See id.* at 775-78 & n.8; *cf. Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 752–58 (5th Cir. 2001) (en banc) (describing FCA's intrusion on Executive's Article II powers as "modest," but upholding constitutionality based on the FCA's control mechanisms); *United States ex rel. Berge v. Bd. of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1457–59 (4th Cir. 1997) (holding government's declination to intervene does not extinguish its interest in the FCA action; in fact its interest remains strong enough to abrogate a state's Eleventh Amendment immunity); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) (relying on FCA's control mechanisms in upholding FCA against "take care" and appointments clause challenges); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 758 (9th Cir. 1993) (same). After all, in a typical civil action that the Department of Justice files on behalf of the United States, the Department of Justice investigates whether to file suit before

the suit is filed. Such a pre-suit investigation is particularly critical before alleging fraud. *See* Fed. R. Civ. P. 9(b), 11. However, in a qui tam action under the FCA, a person unconnected to the Executive files a qui tam suit under the FCA on behalf of the United States. Moreover, the qui tam relator files such a suit with no notice or warning to the Executive, and the Executive may already be conducting a civil or criminal fraud investigation.

Not surprisingly, Congress crafted the FCA in 1986 to address the complexity of modern fraud investigations, the government's limited resources, and the unique nature of a qui tam action under the FCA. As discussed, a qui tam relator must file the qui tam complaint under seal. *See* 31 U.S.C. § 3730(b). The qui tam relator serves the sealed complaint and a statement of material evidence detailing the alleged FCA violations on the United States pursuant to Rule 4(i) of the Federal Rules of Civil Procedure. *See id.* § 3730(b)(2); Fed. R. Civ. P. 4(i). Because the qui tam complaint is filed under seal and is (by definition) the first entry on the docket sheet, the Clerk of Court seals the docket sheet. The act of sealing the docket sheet is ministerial. Both the qui tam complaint and the docket sheet remain sealed for 60 days. *See* 31 U.S.C. § 3730(b). There are no hearings (public or otherwise) during this 60-day period. Rather, the United States has the opportunity to investigate the allegations in order to decide whether to intervene.

Second, the seal provisions mandate judicial review at the end of the 60-day period. Specifically, at the end of the 60-day period, if the United States wishes to extend the seal, it must demonstrate "good cause" to a federal court for extending the seal. Of course, the "good cause" standard in section 3730(b)(3) is the same standard contained in Rule 26 of the Federal Rules of Civil Procedure, which permits a federal court to require that certain matters be sealed. *See* Fed. R. Civ. P. 26(c); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36–37 (1984) (noting that "good cause" standard under the

Federal Rules of Civil Procedure does not require heightened First Amendment scrutiny).

Third, the seal provisions limit the relator only from publicly discussing the filing of the qui tam complaint. Nothing in the FCA prevents the qui tam relator from disclosing the existence of the fraud. Therefore, even if there is a First Amendment right of access to a qui tam complaint and docket sheet sealed in accordance with 31 U.S.C. § 3730(b)(2)–(3), the FCA's seal provisions are narrowly tailored to serve a compelling government interest.

In opposition to this conclusion, appellants argue that the FCA should have been drafted to require that every qui tam relator publicly file every qui tam action, unless the court makes an individualized determination that the complaint should be filed under seal. *See* Appellants' Br. at 39. Under this alternative process, appellants recognize that at least some qui tam complaints would warrant being filed under seal just as some non-FCA complaints are filed under seal. *See id.* In making this argument, appellants fail to meet the rigorous requirements necessary to win a facial First Amendment challenge to 31 U.S.C. § 3730(b)(2)-(3). *See*, *e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008); *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 173–74 (4th Cir. 2009) (en banc); *WV Ass'n of Club Owners and Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 294 (4th Cir. 2009).[7]

In sum, even assuming that the First Amendment right of access extends to a qui tam complaint and docket sheet sealed in accordance with 31 U.S.C. § 3730(b)(2)–(3), appellants'

---

[7]Appellants admit that this is not an overbreadth First Amendment claim. *See* Appellants' Reply Br. at 5; *cf. United States v. Stevens*, 130 S. Ct. 1577, 1587–88 & n.3 (2010) (describing standard applied to an overbreadth First Amendment claim).

facial challenge still fails. Accordingly, we affirm the district court's judgment dismissing that claim under Rule 12(b)(6).

## B.

Next we analyze appellants' claim that the FCA's seal provisions violate the First Amendment by gagging qui tam relators from speaking about the qui tam complaint. In making this claim, appellants concede that they are not relators, but assert that they are "willing listeners" to relators who would like to discuss their qui tam complaints. After considering this claim and the record, the district court concluded that appellants lacked standing to challenge the alleged speech-restricting effect that 31 U.S.C. § 3730(b)(2)-(3) has on relators' ability to disclose the existence of the sealed qui tam complaint. *See ACLU*, 652 F. Supp. 2d at 668–69.

In making this First Amendment argument, appellants rely on a standing doctrine unique to the First Amendment, which provides standing to persons who are "willing listeners" to a willing speaker who, but for the restriction, would convey information. *See*, *e.g.*, *Stephens v. County of Albemarle*, 524 F.3d 485, 491 (4th Cir. 2008). The "willing speakers," according to the appellants, are relators who otherwise would discuss their qui tam complaints with appellants but for 31 U.S.C. § 3730(b)(2)-(3).

In *Stephens*, we analyzed whether a plaintiff had standing to assert such a right to receive speech. *Id.* at 492. There, plaintiff Patricia Stephens alleged that, but for a sealed settlement agreement, she and her deceased husband would have been informed about dangerous conditions existing at his workplace. *Id.* at 486. Although we found that Mrs. Stephens was a willing listener and found that two willing speakers existed, we still held Mrs. Stephens lacked standing. *Id.* at 492–93. In doing so, we held that Mrs. Stephens had to show a direct connection between an identifiable willing speaker and herself as a willing listener. *Id.* Mrs. Stephens could have

shown this direct connection with evidence that the identified willing speakers would have spoken to her in the past but for the speech restriction or would speak with her in the future but for the speech restriction. *Id.* Because Mrs. Stephens failed to show "that there exists a speaker willing to convey the information to her," she lacked standing. *Id.*

Here, appellants have failed to identify any particular qui tam relator who, but for the seal provisions in 31 U.S.C. § 3730(b)(2)-(3), is a willing speaker who desires to speak with appellants. Thus, as in *Stephens*, appellants have failed to show a direct connection between an identifiable willing speaker and the appellants. *See id.* at 492-93; *see also Bond v. Utreras*, 585 F.3d 1061, 1078 (7th Cir. 2009) (collecting cases). Therefore, appellants lack standing to raise this claim. Accordingly, we affirm the district court's judgment dismissing that claim under Rule 12(b)(1).

C.

Appellants claim that the FCA's seal provisions violate the Constitution's separation of powers. Specifically, appellants claim that 31 U.S.C. § 3730(b)(2)-(3) infringes on the inherent power of the lower federal courts by mandating that qui tam relators file FCA complaints under seal, without an opportunity for individual judicial assessment of the need to seal the complaint or the docket sheet.

Congress may not disrupt the balance among the branches of government by preventing another branch from accomplishing its constitutional function. *See*, *e.g.*, *Clinton v. Jones*, 520 U.S. 681, 699–700 (1997); *Morrison v. Olson*, 487 U.S. 654, 696 (1988); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 442-43 (1977). Appellants' argument focuses on the inherent power of lower federal courts. The inherent power of the lower federal courts falls into three main categories, none of which are absolute. *See*, *e.g.*, *In re Stone*, 986 F.2d 898, 901–02 (5th Cir. 1993); *Eash v. Riggins Trucking Inc.*, 757

F.2d 557, 562-64 (3d Cir. 1985) (en banc); *United States v. Brainer*, 691 F.2d 691, 695-96 (4th Cir. 1982). The first category of inherent powers is the core Article III power. This power is generally described as the ability of a lower federal court to decide a case over which it has jurisdiction. *See*, *e.g.*, *United States v. Klein*, 80 U.S. (13 Wall.) 128, 146–47 (1871); *Brainer*, 691 F.2d at 695. Essentially, once Congress has established lower federal courts and provided jurisdiction over a given case, Congress may not interfere with such courts by dictating the result in a particular case. *See*, *e.g.*, *Brainer*, 691 F.2d at 695. The second category of inherent powers consists of those powers "necessary to the exercise of all others." *In re Stone*, 986 F.2d at 902 (quotation omitted). "For the most part, these powers are deemed necessary to protect the efficient and orderly administration of justice and those necessary to command respect for the court's orders, judgments, procedures, and authority." *See id.* These powers are subject to congressional regulation. *See Brainer*, 691 F.2d at 695-97 (noting power of federal courts to make procedural rules in the absence of congressional directive and describing the contempt power as an example). The third category of inherent powers "includes those reasonably useful to achieve justice." *In re Stone*, 986 F.2d at 902. Examples of such powers include "the power of a district court to appoint an auditor to aid in litigation involving a complex commercial matter." *Id.* Such powers are subject to congressional regulation. *Id.*

The power at issue in this case — whether to seal a complaint or a docket sheet for 60 days — appears to fit into the third category of powers. At most, it reaches the second category. In either event, 31 U.S.C. § 3730(b)(2)-(3) does not violate the separation of powers under the Constitution. *See Brainer*, 691 F.2d at 698-99 (rejecting facial and as applied separation-of-powers challenge to Speedy Trial Act). As in *Brainer*, the FCA's seal provisions are a proper subject of congressional legislation and do not intrude on "the zone of judicial self-administration to such a degree as to prevent the judiciary from accomplishing its constitutionally assigned

functions." *Id.* at 698 (quotation omitted). Accordingly, we affirm the district court's judgment dismissing that claim under Rule 12(b)(6).

D.

Finally, we respectfully offer a few thoughts in response to the dissenting opinion. First, the dissent describes Congress's decision to add the FCA's seal provisions in 1986 as "rather puzzling," Post at 25, but the legislative history explains why Congress added the seal provisions. *See* S. Rep. No. 99-345, at 24–25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289–90. Next, the dissent claims that the FCA's seal provisions "effectively prohibit[ ] public discussion of an entire topic." Post at 27 (quotations and citation omitted). The FCA's seal provisions, however, only preclude a qui tam relator who wants to use the FCA to recover money from discussing the FCA complaint for a brief period of time. Given that Congress created the FCA's qui tam right to bring suit in the name of the United States, Congress certainly could add conditions to safeguard the interests of the United States. Moreover, as we have explained, the FCA does not bar the qui tam relator from discussing the underlying fraud.

Third, the dissent claims that invalidating the FCA's seal provisions will bolster the role of relators and help to prevent under-enforcement of the FCA. *See* Post at 28–29. However, Congress has chosen a different balance among relators, the United States, and those subject to FCA actions.

Fourth, the dissent contends that protecting on-going fraud investigations is not compelling. Post at 29–30. However, in *Virginia Department of State Police*, we stated "our complete agreement with the general principle that a compelling governmental interest exists in protecting the integrity of an ongoing law enforcement investigation." 386 F.3d at 579. The dissent also claims we must make an "individualized assessment" of the government's claimed compelling interest. Post

at 29. However, such an assessment is impossible until an as-applied challenge is properly before us.

Next, the dissent suggests that the FCA's seal provisions are not narrowly tailored because some federal courts in some FCA cases grant government motions to extend the FCA's seal after applying the "good cause" standard in 31 U.S.C. § 3730(b)(3). *See* Post at 31. As a result, the seal is sometimes extended beyond the 60-day period. *See id.* The "good cause" standard, however, comports with the First Amendment. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36–37 (1984). Moreover, Congress intended courts to apply that standard and to "weigh carefully" any such extension beyond the 60-day period. *See* S. Rep. No. 99-345, at 24–25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289–90. To the extent the dissent is troubled by how often federal courts grant government motions to extend the seal beyond the 60-day period or how long federal courts have extended the seal in certain cases, the dissent's real complaint arises from each federal court's independent decision to extend the seal. However, before a federal court extends the seal in accordance with the FCA's statutory scheme, the federal court has reviewed the record and the motion and applied the "good cause" standard. Notably, in camera proceedings are very common in the federal judiciary. *In re N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 410 n.4 (2d Cir. 2009). Such proceedings include grand jury proceedings, certain proceedings involving national security, trade secrets, state secrets, or personal safety, certain proceedings involving minors, and the process of applying for a search warrant. *See id.*; *see*, *e.g.*, *In re Grand Jury*, 478 F.3d 581, 584–88 (4th Cir. 2007); *Sterling v. Tenet*, 416 F.3d 338, 342–49 (4th Cir. 2005); *James v. Jacobson*, 6 F.3d 233, 238–42 (4th Cir. 1993); *In re Application & Affidavit for a Search Warrant*, 923 F.2d 324, 328–31 (4th Cir. 1991). Similarly, courts sometimes receive and review "other forms of sensitive information *in camera* and *ex parte*." *In re N.Y. Times Co.*, 577 F.3d at 410 n.4. In these situations, just as when applying the

FCA's "good cause" standard, "the courts seek to balance the need for transparency in the judiciary with the effective protection of sensitive information." *Id.*

Ultimately, the dissent cites "sunlight" and "openness" as reasons for invalidating Congress's policy preference in the FCA's seal provisions. We agree that "sunlight" and "openness" are important values that further the functioning of this republic and note that in every FCA case, the qui tam complaint will be unsealed. Thus, in every FCA case, the people will be able to see how the Executive and the Judiciary have fulfilled their constitutional and statutory roles. Concomitantly, we recognize the United States Code includes a myriad of statutes where Congress has mandated the sealing of certain sensitive information filed with a court.[8] Although "opac-

---

[8]*See*, *e.g.*, Fed. R. Civ. P. 5.2; Fed. R. Crim. P. 49.1 (mandating sealing as to certain personal, private identifications such as individual social-security numbers) (adopted in compliance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat 2899, 2913–15); 8 U.S.C. § 1535(a) (mandating seal and ex parte hearing of appeals concerning denial of application for removal of an alien suspected of terrorism); 12 U.S.C. § 3410(b) (providing for in camera response of government to a customer motion to quash a bank record subpoena); 15 U.S.C. § 1116(d)(8) (mandating the sealing of a court order — and all supporting documents — directing seizure of counterfeit goods until subject of order "has an opportunity to contest" the order); 18 U.S.C. § 3333(c)(1) (mandating the sealing of a Special Grand Jury's report for 31 days following service on public officers named therein); 18 U.S.C. § 3509(d)(2) (mandating sealing of child victim's or witness's names and "other information" concerning the child); 28 U.S.C. § 1610(f)(2)(B)(i) (allowing Secretaries of State and Treasury discretion to provide information to court under seal in executing on assets of foreign states); 31 U.S.C. § 5318A(f) (allowing ex parte and in camera submission of evidentiary support for Secretary of Treasury's designation of a "primary money laundering concern"); 42 U.S.C. § 10608(c) (mandating sealing of any tapes created by closed-circuit broadcast of court proceedings for victims of crime); 42 U.S.C. § 14011(b)(6) (mandating the sealing of court proceedings pertaining to and the results of sexually transmitted disease testing of sexual-assault defendants and prohibiting disclosure beyond limited parties). We need not and do not address whether these statutes comport with the First Amendment.

ity" may very well "deteriorat[e] the quality of our democracy," Post at 32, Congress has determined temporary confidentiality can assist the functioning of certain processes, including certain processes involving the Executive and Judiciary. Congress made one such constitutionally permissible choice in adding the seal provisions to the FCA, and we respectfully disagree that the dissent's assessment of "openness" and "sunlight" should trump Congress's assessment.

## III.

As explained above, the judgment of the district court is affirmed.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

The majority upholds the automatic sealing of vital court documents that pertain to important national issues and often remain secret for years. Consequently, we may never know what wasteful spending and fraud against the public fisc persists because of government delay, inaction, or under-enforcement of the False Claims Act (FCA). I respectfully dissent because transparency remains central to combating waste and fraud, because 31 U.S.C. § 3730(b)(2)-(3) is facially unconstitutional, and because the Government fails to justify its First Amendment infringement with compelling interests and narrow tailoring. In turn, I address the history, text, and constitutionality of section 3730(b)(2)-(3).

## I.

For 123 years, the FCA relied on public citizens to help fight fraud without restricting freedom of speech. *Compare* An Act to Prevent and Punish Frauds upon the Government of the United States, 12 Stat. 696 (1863) (original enactment) *with* False Claims Amendments Act of 1986, 100 Stat. 3153

(1986) (seal amendments). At oral argument, the Government agreed that the law operated for more than 120 years without mandatorily closing the record. Passed in response to "the fraudulent use of government funds during the Civil War," *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968), the original FCA legislation specified that "suit may be brought and carried on *by any person*, as well for himself as for the United States." 12 Stat. at 698 (emphasis added). This clause is known as the qui tam provision. Senator Jacob Howard, the bill's sponsor and floor manager, explained that the provision was "based . . . upon the old-fashion idea of hold[-ing] out a temptation, and '*setting a rogue to catch a rogue*,' which is the safest and most expeditious way I have ever discovered of bringing rogues to justice." 33 Cong. Globe 955-56 (1863) (remarks of Sen. Howard) (emphasis added), quoted in Charles Doyle, Congressional Research Service Report for Congress, *Qui Tam: The False Claims Act and Related Federal Statutes* 5 (2009). By utilizing members of the public to identify fraud, the FCA's qui tam provisions have comprised 80% of FCA cases in 2010 and recovered more than $18 billion in the last twenty-three years. Department of Justice, *False Claims Act Statistics* 2 (Nov. 23, 2010), *quoted in* slip op. 11 n.4.

The FCA's legacy of transparency comports with the fact "that historically both civil and criminal trials have been presumptively open." *Richmond Newspapers v. Va.*, 448 U.S. 555, 580 n.17 (1980) (Burger, C.J.) (plurality opinion). "From [ ] early times, although great changes in courts and procedure took place, one thing remained constant: the public character of the trial. . . ." *Id.* at 566. "This is no quirk of history; rather, it has long been recognized as an indispensable attribute of an Anglo-American trial," promoting virtues such as fairness, truthfulness, decorum, objectivity, and legitimacy. *Id.* at 569. "[O]pen justice" constitutes a "keystone" of our judicial system, since "'[w]ithout publicity, all other checks [and balances] are insufficient. . . .'" *Id.* at 569 (citing 1 J. Bentham, *Rationale of Judicial Evidence* 524 (1827)).

## II.

In that light, it is rather puzzling that the FCA was amended in 1986 to automatically seal all complaints. The pertinent portion of the FCA now reads as follows:

> (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. *The complaint* shall be filed *in camera*, shall remain under seal for at least *60 days*, and shall not be served on the defendant *until the court so orders*. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

> (3) The Government may, for *good cause* shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

31 U.S.C. § 3730(b) (emphasis added) (hereafter, "section 3730(b)(2)-(3)" or "the seal provision").

Appellant seeks to maintain the longstanding tradition of 'open justice' as it applies to the FCA. Specifically, Appellant lodges a facial attack against section 3730(b)(2)–(3), and claims that statute violates the First Amendment. "To succeed

in a typical facial attack," litigants must "establish 'that no set of circumstances exists under which [the law] would be valid.'" *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (citations omitted). While relaxed standards apply to First Amendment claims that a statue is overbroad, the majority correctly notes that Appellant has made no such claim here. Slip Op. 16 n.7; App. Br. 5.

The Government also has a significant burden in defending section 3730(b)(2)-(3). "The circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. . . . It must be shown that the denial is necessitated by a compelling . . . interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606-607 (1982). In the civil context too, the Government must articulate a compelling interest and narrow tailoring, as the majority notes. Slip Op. 13 (citing *Globe Newspaper Co.*). Complaints, it goes almost without saying, have a foundational function in civil trials.

"We review de novo a properly preserved constitutional claim." *United States v. Hall*, 551 F.3d 257, 266 (4th Cir. 2009).

## III.

Section 3730(b)(2)–(3) is facially unconstitutional because it automatically and categorically seals all FCA complaints for at least 60 days. By its plain terms, the statute seals "the complaint" for "at least 60 days," renewable "for good cause," and requires the complaint "not be served on the defendant until the court so orders." 31 U.S.C. § 3730(b)(2)–(3).\* That

---

   *Section 3730(b)(2)–(3) uses the phrases "in camera" and "under seal" somewhat interchangeably. That section of the law is generally known as the 'seal provision'— 'seal' being the operative term. *Compare Black's Law Dictionary* 763 (7th ed., 1999) (defining "in camera" primarily as "[i]n the judge's private chambers.") *with id.* at 1350 (defining "seal" to include "to prevent access to (a document, record, etc.)").

violates the fundamentally "public character of the trial" as well as our tenet "that historically both civil and criminal trials have been presumptively open." *Richmond Newspapers*, 448 U.S. at 566, 580 n.17.

As the majority acknowledges, slip op. 13, our Circuit has recognized the value of this openness and found that the public has a First Amendment right to access civil dockets. In *Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, we found that "[p]ublicity of [court] records . . . is necessary in the long run so that the public can judge the product of the courts in a given case." 203 F.3d 291, 303 (4th Cir. 2000). We have also held that "the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case." *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). *See also Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575–78 (4th Cir. 2004) (finding a right to access documents filed in connection with an opposition to a summary judgment motion); *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178 (4th Cir. 1988) (overturning the sealing of an entire record, except for the complaint, in an employment dispute), 948 F.2d 128 (4th Cir. 1991) (subsequently rejecting the sealing of three documents because the trial court "declined to set forth any interest of its own, compelling or otherwise").

Section 3730(b)(2)–(3) impermissibly engages in content-based restrictions on speech, since it seals both content and the act of filing the complaint—and requires a district court to proactively order it be served on a defendant. This effectively "prohibit[s] public discussion of an entire topic." *Carey v. Brown*, 447 U.S. 455, 463 n.6 (1980) (citing *Consol. Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530 (1980)). These sorts of "[c]ontent-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Therefore, Appellant has "establish[ed] 'that no set of circum-

stances exists under which [the law] would be valid.'" *Stevens*, 130 S. Ct. at 1587.

The speech involved here is particularly valuable. Filing an FCA complaint is a symbolic and significant action—and the content of that complaint contains essential details about alleged fraud. Freedom to speak about the complaint allows relators to publicly say they have identified fraud and initiated a lawsuit, to invite the government to intervene, or to criticize the government for delay, inaction, or under-enforcement. The public interest in accessing FCA complaints is also especially strong, given the prominent and public role of qui tam relators. Transparency allows the public to monitor the progress of FCA enforcement since the "[p]ublicity of [court] records . . . is necessary in the long run so that the public can judge the product of the courts in a given case." *Columbus-America Discovery Group*, 203 F.3d at 303. This is just the type of case where "the public interest in access, and the salutary effect of publicity, may be as strong as, or stronger than, in most criminal cases." *Gannett Co. v. DePasquale*, 443 U.S. 368, 387 n.15 (1979).

More broadly, the freedom to speak about FCA complaints bolsters the public role of relators and pressures the government to rigorously enforce the FCA—or to expeditiously decline to intervene. It also reduces the risk that the government will under-enforce the FCA for political reasons, such as against campaign donors. Indeed, there is reason to believe that speech about FCA under-enforcement remains important. *See, e.g.*, Department of Defense, *Report to Congress on Contracting Fraud*, Table 2 at 4 (January 2011), *available at* http://sanders.senate.gov/graphics/Defense_Fraud_Report1 .pdf (finding that the United States paid $269 billion to defense contractors who had prior civil judgments against them for fraud, between 2007 and 2009 alone). While relators' speech on this front might be disruptive or rare, our government "may not suppress . . . the dissemination of views

because they are unpopular, annoying or distasteful." *Murdock v. Pennsylvania*, 319 U.S. 105, 116 (1943).

The majority, in concluding otherwise, adopts the Government's argument that it has "a compelling interest in protecting the integrity of ongoing fraud investigations." Slip Op. 13; Gov Br. 25. But we should not so readily accept the Government's generalized formulation of its 'compelling' interests. As our Court reasoned

> not every release of information contained in an ongoing criminal investigation file will necessarily affect the integrity of the investigation. Therefore, it is not enough simply to assert this general principle without providing specific underlying reasons for the district court to understand how the integrity of the investigation reasonably could be affected by the release of such information. Whether this general interest is applicable in a given case will depend on the specific facts and circumstances presented in support of the effort to restrict public access.

*Washington Post*, 386 F.3d at 579.

Neither the majority opinion nor the text of 3730(b)(2)–(3) allows for such an individualized assessment of compelling interests. The seal provisions apply categorically to all litigants—regardless of whether any secrecy is needed or requested, whether a fraudster has already been 'tipped off,' or whether the Government itself seeks to publicize the allegations. This stands in stark contrast with the case-by-case assessments that are required to seal criminal proceedings. *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10 (1986) (requiring individualized "findings specific enough that a reviewing court can determine whether the closure order was properly entered.") (citations omitted). Even without section 3730(b)(2)–(3), district courts retain the power to conduct in camera review when it is necessary in a particular

case. *See, e.g.*, *Yeager v. Drug Enforcement Admin.*, 678 F.2d 315, 324 (D.C. Cir. 1982) ("A district court has 'inherent discretionary power' to allow access to in camera submissions where appropriate.") (citation omitted); *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1581 (9th Cir. 1989) ("District courts have the inherent power to receive in camera evidence and place it under seal in appropriate circumstances.") (citation omitted); Fed. R. Civ. P. 5.2(d)-(e) (establishing rules for filings made under seal and protective orders). Additionally, even if we accept the Government's claim that the FCA allows speech about 'underlying facts,' that actually undermines the 'compelling' nature of their stated interests. Allowing relators to publicize all of the 'underlying facts,' even without mentioning the complaint per se, would surely alert many wrongdoers. That is too self-defeating to be 'compelling.'

Moreover, section 3701(b)(2)-(3) is not narrowly tailored. The majority mistakenly accepts the Government's claim that the FCA does not prevent qui tam "relator[s] [from] disclos-[ing] the facts underlying their allegations of fraud." Gov. Br. 35; Slip Op. 16 ("Nothing in the FCA prevents the qui tam relator from disclosing the existence of the fraud."). But in reality, the Government has construed the seal provisions more broadly—in this case and many others. "The seal requirement has [ ] been held to apply not only to the complaint itself, but also to other documents filed prior to the government's notice of intervention such as motions for extension of time and accompanying memoranda and affidavits." John T. Boese, 1 *Civil False Claims and Qui Tam Actions* 4-215 (4th ed., 2011) (hereinafter Boese) (citations omitted).

Without relying on the complaint, other documents and affidavits, or any evidence contained therein, I am hard-pressed to see how any relator could still speak about fraud without violating the seal provisions or being chilled. Under this reading of the statute, the Government could threaten criminal prosecution against anyone who discusses even the

basic facts of fraud, as Appellant alleges happened when it disclosed fraud to a newspaper. App. Br. 12-13. The Government could also move to dismiss the case altogether, as it regularly does. Boese at 4-216 to 4-217; 4-217 n.819 (collecting cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits where "the relator's failure to adhere to these [seal] provisions resulted in the dismissal of the qui tam action.").

Furthermore, section 3701(b)(2)-(3) is not narrowly tailored in how long it applies. The majority emphasizes that FCA complaints are sealed for a "narrow window of time (i.e., 60 days)," and renewable only for "good cause." Slip Op. 14, 15. But by its plain terms, even after 60 days, a court must still proactively order the complaint be served on the defendant, and thus made meaningfully public. And in practice, the 60-day expiration is largely illusory: A 2009 Federal Judicial Center report found that "nearly half of the cases filed in 2008 [the previous year] are sealed as of late October 2009, but approximately 15% of cases *filed early in the decade* are still sealed late in 2009." Federal Judicial Center, *Sealed Cases in Federal Courts* 5 (October 23, 2009) (emphasis added), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/sealcafc.pdf/$file/sealcafc.pdf. A leading treatise reiterated that "most cases remain under seal for *well over 60 days*." Boese at 4-224 (emphasis added) (citing *United States ex rel. Givler v. Smith*, 760 F. Supp. 72 (E.D. Pa. 1991) (sealed for 11 months); *United States ex rel. Curnin v. Bald Head Island Limited*, No. 09-1931, 2010 WL 2255817 (4th Cir. June 4, 2010) (sealed for upwards of 5 years)). Additionally, the published guide for a U.S. Attorney's office acknowledges that "most intervened or settled [FCA] cases are under seal for *at least two years*. . . ." U.S. Attorney for the Eastern District of Pennsylvania, *False Claims Act Cases: Government Intervention in Qui Tam (Whistleblower Suits)* (emphasis added), *available at* http://www.justice.gov/usao/pae/Documents/fcaprocess2.pdf.

Because I would hold that section 3730(b)(2)–(3) unconstitutionally limits free speech, I would not reach Appellant's additional claims about 'willing speakers' or separation of powers.

Ultimately, opacity inflicts causalities in the darkened corners of our government, deteriorating the quality of our democracy subtly but surely. That the seal provision often lasts for years only worsens matters. In today's era of growing debts and deficits, the FCA's lack of transparency has especially stark fiscal implications. Instead of striving to categorically conceal this area of civil dockets, I would more rigorously apply the First Amendment and selectively seal records. Justice Brandeis said it best: "[s]unlight is . . . the best of disinfectants." *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (quoting L. Brandeis, *Other People's Money* 62 (National Home Library Foundation ed. 1933)).